Crosby Wilfredo ORANTES–
HERNANDEZ, et al.,
Plaintiffs,

v.

Eric HOLDER, Attorney General of
the United States, Defendant.

Case No. CV 82–01107 MMM (VBKx).

United States District Court,
C.D. California.

March 29, 2010.

Linton Joaquin, Karen C. Tumlin, National Immigration Law Center, Los Angeles, CA, Mark D. Rosenbaum, Ranjana Natarajan, ACLU Foundation of Southern California, Los Angeles, CA, Lucas Guttentag, Judy Rabinovitz, Jennifer Chang Newell, ACLU Foundation Immigrants' Rights Project, San Francisco, CA, for Plaintiffs.

Victor M. Lawrence, Office of U.S. Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, Frank Michael Travieso, AUSA–Office of U.S. Attorney, John E. Nordin, II, SAUSA–Office of U.S. Attorney, Los Angeles, CA, for Defendant.

## ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS UNDER THE EQUAL ACCESS TO JUSTICE ACT

MARGARET M. MORROW, District Judge.

### I. PROCEDURAL BACKGROUND

Plaintiffs filed this action in 1982, challenging practices and procedures allegedly employed by the Immigration and Naturalization Service ("INS") to detain, process and remove Salvadoran nationals who had entered the United States. Plaintiffs sued on their own behalf and on behalf of a class of "all citizens and nationals of El Salvador eligible to apply for political asylum ... who ... have been or will be taken into custody ... by agents of the [Department of Homeland Security]." *Orantes–Hernandez v. Meese,* 685 F.Supp. 1488, 1491 (C.D.Cal.1988), aff'd, 919 F.2d 549 (9th Cir.1990) ("*Orantes II* "). Judge

David Kenyon certified the *Orantes* class on April 30, 1982.[1]

On April 29, 1988, Judge Kenyon entered a permanent injunction mandating that the INS use specific procedures when detaining, processing and removing Salvadoran immigrants. See *Orantes II,* 685 F.Supp. at 1511–13. On July 2, 1991, he modified the injunction to add four conditions that applied solely to the Port Isabel Service Processing Center in Port Isabel, Texas ("*Orantes* injunction"). He also approved a settlement of plaintiffs' application for attorneys' fees and costs incurred to that point in the litigation. On September 28, 2004, the court entered a stipulated order clarifying the terms of the injunction to eliminate the possibility that the Office of Refugee Settlement could be held to be in violation of its terms.

On November 28, 2005, the government filed a motion to dissolve the injunction. It asserted (1) that there had been a significant change in the factual circumstances that led to issuance of the injunction—i.e., the end of the civil war and attendant human rights abuses in El Salvador, and the adoption of a range of procedures by U.S. immigration authorities that ensured aliens were advised of their right to apply for asylum and not coerced into waiving that right; and (2) that there had been an intervening change in law—i.e., the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), providing for the expedited removal of inadmissible aliens. As respects the intervening change in law, the government argued that the injunction conflicted with

---

1. The original class certified by Judge Kenyon encompassed not only Salvadorans who had been or would be in custody and were eligible to apply for political asylum, but also Salvadorans who, subsequent to June 2, 1980, requested, or would in the future request, political asylum whose claims had not yet been presented or adjudicated. See *Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 355 (C.D.Cal.1982) ("*Orantes I* "). Plaintiffs later abandoned claims on behalf of the second group of Salvadorans. *Orantes II,* 685 F.Supp. at 1491.

IIRIRA and the regulations governing expedited removal, and also that the injunction made it burdensome for immigration authorities to place Salvadorans in expedited removal.

In response to the government's motion, plaintiffs requested limited discovery. At a status conference held December 21, 2005, the government opposed the request and asserted that the court had no jurisdiction to review expedited removal procedures. The court granted plaintiffs' request for discovery and established a briefing schedule for resolving the government's jurisdictional objections. On August 31, 2006, the court agreed to bifurcate and hear the defendant's argument that there was a facial conflict between the injunction and the expedited removal statute before addressing the remaining reasons advanced for dissolving the injunction.

The 120–day period for discovery on issues other than expedited removal closed in early May 2006. The government limited production of documents regarding detention standards to those pertaining to seventeen standards it considered relevant to the injunction. Plaintiffs contended they were entitled to additional discovery and the court resolved the parties' dispute on October 13, 2006 by ordering the production of documents relevant to one additional standard, the Hold Room Standard.

The court held a hearing on defendant's jurisdictional objection that it lacked jurisdiction to review expedited removal procedures on May 8, 2006. At the hearing, the government raised a new argument, namely, that plaintiffs lacked standing to challenge the regulations implementing expedited removal. As a consequence, the court ordered further briefing on the issue. The court ultimately rejected the govern-ment's characterization that plaintiffs' opposition to dissolution of the injunction was a challenge to the expedited removal statute and implementing regulations, and found that the jurisdictional restrictions contained in the expedited removal statute did not apply. On August 21, 2006, the court granted plaintiffs' request for limited discovery on expedited removal.

In response to the court's ruling, the government asserted that there was a facial conflict between the expedited removal statute and Judge Kenyon's injunction, and requested that the court order briefing and a hearing on that question before requiring it to produce any expedited removal discovery. The court acceded to this request, and set a schedule for briefs addressing whether paragraph 2 of the injunction, which mandated that the government provide Salvadorans an advisal regarding of their right to apply for asylum, and paragraph 11, which concerned transfer of Salvadorans between facilities, were facially in conflict with the expedited removal statute.

On October 11, 2006, the court issued an order regarding the facial conflict between the expedited removal statute and Judge Kenyon's injunction. As respects paragraph 2 of the injunction, the court found that the *Orantes* advisal concerning the right to apply for asylum did not conflict with the expedited removal statute as the notification requirement merely imposed an additional obligation on the government and did not mandate that it take action that was prohibited by the statute.[2] The court agreed with the government that there was a more limited conflict between paragraph 2 and the statute, however. Because "the right to representation by an attorney does not attach until an alien is found to have a credible fear of persecu-

2. Order re Alleged Facial Conflicts Between the Permanent Injunction and the Expedited Removal Statute ("Oct. 11, 2006 Order"), Docket No. 782 (Oct. 11, 2006) at 11.

tion," the court concluded that paragraph 2 conflicted with the expedited removal statute to the extent it required the government to advise all Salvadorans—including those without a credible fear of persecution—that they had a right to be represented by an attorney.[3] The court also found that paragraph 2's requirement that the government advise all Salvadorans of their right to a deportation or removal hearing conflicted with the expedited removal statute because, under that statute, only aliens found to have a credible fear of persecution in their country of origin are entitled to a removal hearing.[4] To remedy these conflicts, the court *modified*—but did not *dissolve* paragraph 2 to remove these conflicts.

The government also requested that the court delete paragraph 11 in its entirety on the basis of a purported facial conflict.[5] The court concluded that there was no facial conflict between paragraph 11 and the expedited removal statute. Nonetheless, it modified that paragraph of the injunction to clarify that as used therein, "transfer" meant transfer between detention facilities within the United States, not removal from the country pursuant to a final order of removal.[6]

Because the court declined to eliminate paragraphs 2 and 11 in their entirety, as the government had requested, it conclud-ed that plaintiffs were entitled to limited discovery on expedited removal. It modified its earlier discovery order, however, because the modifications to the injunction that it made mooted the government's prior argument that the injunction placed excessive burdens on its ability to place Salvadorans in expedited removal.[7]

The government subsequently sought reconsideration of the court's order regarding discovery, asserting that no discovery regarding expedited removal was required given it no longer claimed the injunction burdened the expedited removal of Salvadorans from the country. The court denied this motion on October 26, 2006, noting that the government continued to maintain that the injunction should be dissolved in its entirety. The government also sought clarification of modified paragraph 2, noting that, since the inception of the injunction, it had construed the order to apply only between ports of entry, not at ports of entry. The government's explanation of its interpretation of the injunction flatly contradicted representations the government had made regarding its implementation of the injunction at prior hearings. Because the issue had not been fully briefed, the court declined to provide the clarification sought by the government and noted that it would address the issue at the time of the hearing on the motion to dissolve the injunction.[8]

---

**3.** *Id.* at 14.

**4.** *Id.* at 8.

**5.** *Id.* at 21. The government also requested that the court amend the class definition to include only Salvadorans who had been place in § 240 proceedings. The court declined this request, finding it overbroad, as it would eliminate all protections mandated by the injunction for class members processed through expedited removal. *Id.* at 21–22.

**6.** *Id.* at 25 ("The term 'transfer' as used in this paragraph refers to the relocation from one detention facility to another of class members who are held in detention pending the initiation or resolution of their immigration proceedings. The restrictions of this paragraph do not apply to the detention, transfer, or other transportation of individuals who are subject to final orders of removal entered as a result of expedited removal proceedings").

**7.** *Id.* at 26–29.

**8.** Order Regarding *Ex Parte* Applications For Reconsideration And Clarification ("October 26, 2006 Order"), Docket No. 787 (Oct. 26, 2006).

The parties then met and conferred regarding the form of the modified *Orantes* advisal to be provided to class members in expedited removal. The parties could not reach agreement and submitted separate briefs on the issue. On November 13, 2006, the court found the government's assertion that the court had relieved it of the obligation to provide any advisal to Salvadorans in expedited removal contrary to both its October 11 and October 26, 2006 orders. The court explicitly clarified that the advisal had to be given to class members at the time they were processed in secondary inspection at the border or processed after being found within the territorial boundaries of the United States.[9]

On July 24, 2007, the court denied the government's motion to dissolve Judge Kenyon's injunction, holding that the government had failed to carry its burden of showing significantly changed factual conditions warranting dissolution. *Orantes–Hernandez v. Gonzales ("Orantes IV")*, 504 F.Supp.2d 825, 874–76 (C.D.Cal.2007). Noting "that it is appropriate to consider present conditions in El Salvador, and [to] contrast them with the conditions that obtained at the time Judge Kenyon entered a permanent injunction, in evaluating whether all of the circumstances that presently

obtain warrant[ ] dissolution of the injunction," *id.* at 838, the court evaluated and compared not only past and present conditions in El Salvador, but also past and present INS practices, and past and present conditions in detention centers in the United States. *Id.*

As respects conditions in El Salvador, the court noted that "[n]either party seriously disputes that conditions in El Salvador are drastically different than they were in the 1980s when Judge Kenyon entered the *Orantes* Injunction. The civil war is over, as is the widespread brutality that led the court to conclude in 1982 and 1988 that a 'substantial number' of Salvadorans who fled the country had good faith asylum claims and well-founded fears of persecution." *Id.* at 840 (citing *Orantes II*, 685 F.Supp. at 1491). For this reason, the court found that "the conditions in El Salvador that led Judge Kenyon to conclude that the consequences attending deprivation of Salvadorans' right to apply for asylum were 'most serious' disappeared with the end of the civil war and concomitant improvements in political, economic, and social conditions in the country." *Id.*[10]

The government argued that it had made overarching, structural changes in

9. Order Regarding Proposed Modified *Orantes* Advisals ("November 13, 2006 Order"), Docket No. 791 (Nov. 13, 2006).

10. The court noted plaintiffs' argument that "the *Orantes* injunction remains necessary to protect the rights of Salvadorans because even today, El Salvador is 'a country in significant chaos.' For this reason, plaintiffs contended, some Salvadorans continue to have good faith claims to asylum in the United States." *Orantes IV*, 504 F.Supp.2d at 840. Plaintiffs relied on evidence of, *inter alia*, domestic violence, gender-based persecution, violence against persons who are homosexual, transgender, HIV-positive, and further widespread gang violence. *Id.* The court held that plaintiffs' evidence of violence, "while indicative of a country experiencing social difficul-

ties, is not relevant to the court's inquiry regarding changed circumstances in El Salvador." *Id.* at 843. It observed that it was tasked only with "determining whether changed circumstances have rendered the *Orantes* injunction unnecessary ... [and that it was appropriate in that regard to] consider the conditions that led Judge Kenyon to enter the injunction in the first instance, not a new set of conditions that might warrant the entry of an injunctions were they presented to a court today." *Id.* The court was convinced that the "dramatic nature of the changed conditions in El Salvador" [indicates] that, were he reviewing the matter today, Judge Kenyon would not find that the *Orantes* advisal is necessary "'as a matter of due process.'" *Id.* at 844 (quoting *Orantes III*, 919 F.2d at 556).

the manner in which it processed immigration detainees. These included, *inter alia*, forms and procedures designed to ensure that aliens were advised of their right to apply for asylum and the promulgation of detention standards governing conditions at detention facilities. It asserted that these changes showed that there was no longer any need for the injunction to remain in place. *Id.* at 845–46. Noting that compliance with the terms of an injunction was a factor that courts took into account in assessing whether to dissolve the order, the court observed that all parties conceded there had been no enforcement proceedings in eighteen years. *Id.* at 846 ("The lack of enforcement proceedings is particularly persuasive in the context of an injunction mandating that the government take specific action with respect to as many as 40,000 individuals each year"). It considered the parties' competing evidence as to whether 37 Salvadorans recently apprehended and detained by the Border Patrol had, or had not, received *Orantes* advisals, and found " "[n]either set of declarations ... entirely credible." Moreover, it concluded that "the sample size [was] too limited ... to support an inference that there is a widespread pattern of noncompliance." *Id.* at 847–48. The court also considered the government's admission that it had not been giving *Orantes* advisals to Salvadorans detained at ports of entry as opposed to those detained *between* ports of entry, and found that the government's interpretation "cast[ ] some doubt on [its] assertion that it ha[d] complied with the injunction in good faith and that it [was] committed to ensuring that aliens [were] not removed without adequate notice of their rights." *Id.* at 850. In sum, the court found that "evidence of the government's compliance with the advisal requirement [was] mixed." *Id.* at 851.

The court acknowledged that the government had adopted forms and regulations designed to ensure that all aliens, including Salvadorans, were not removed unless they understood their right to apply for asylum. It found no evidence, however, that the forms were used in practice. In fact, the court noted, "evidence regarding use of the form ... raises substantial concerns" about the government's efforts to advise aliens of their right to apply for asylum, particularly at the San Ysidro port-of-entry. *Id.* at 854–55.

Similarly, despite the government's adoption of detention standards, the court noted that, as respects detention centers for which reviews were produced, the American Bar Association, the United Nations High Commissioner for Refugees, and Immigration and Customs Enforcement had "documented a significant number of violations relevant to the provisions of the *Orantes* injunction and/or the concerns that led to its issuance." *Id.* at 872–73. Based on the voluminous evidence presented, the court found a record of government compliance only with respect to paragraphs 10 and 12, which concerned administrative segregation and group legal presentations at the Port Isabel Service Processing Center. *Id.* at 875.

The court concluded:

"Had the record revealed that maintenance of the injunction was no longer required to fulfill the purposes for which it was entered, the court would not have hesitated to dissolve it. For the reasons stated, however, the court concludes the government has not established that promulgation of the ICE detention standards and the end of the Salvadoran civil war constitute sufficiently changed circumstances that all provisions of the *Orantes* injunction related to detention conditions should be dissolved. Documented levels of non-compliance with relevant standards indicate that the injunction remains necessary to ensure

that Salvadorans are able to exercise their right to apply for asylum freely and intelligently." *Id.* at 876.

Following entry of the court's order, plaintiffs requested that the government agree to consolidate all active provisions of the injunction in a single order to facilitate enforcement. The government declined to enter into this stipulation, and plaintiffs filed a motion to consolidate the injunctive provisions. They requested issuance of a consolidated order "to provide clarity, and to promote compliance with the injunctions," and asserted that consolidation would not "affect[ ] or prejudice[ ] [the governments's appeal] in any manner...."[11] The government countered that the court had been divested of jurisdiction by its filing of a notice of appeal,[12] and argued that consolidation of the injunctions in a single order would constitute a material change that would alter the posture of the case on appeal.[13] The specific change that concerned the government was the inclusion of a sentence in paragraph two of Judge Kenyon's order that was not included in the court's modified paragraph 2; plaintiffs wished to have this sentence included in the consolidated injunction.

On September 24, 2007, the court granted plaintiffs' motion for consolidation. It addressed the government's concern by clarifying that the sentence at issue remained part of the injunction, because the modified language the court adopted on October 11, 2006 concerned only those portions of paragraph 2 that conflicted with the expedited removal statute.[14] The

court concluded, as a result, that consolidating the remaining provisions of the injunction in a single order did not constitute a material change that altered the posture of the case on appeal.[15] The government subsequently appealed this ruling as well.[16]

On April 6, 2009, the Ninth Circuit affirmed the court's orders in their entirety. *Orantes–Hernandez v. Holder* ("*Orantes V*"), 321 Fed.Appx. 625, 629 (9th Cir.2009)(Unpub.Disp.). The government sought and received an enlargement of time to July 6, 2009 to file a petition for rehearing and rehearing en banc. On that date, however, it filed a notice advising the court and plaintiffs that it would not seek rehearing.

On August 4, 2009, plaintiffs filed a motion for attorneys' fees and costs under the Equal Access to Justice Act ("EAJA"). The government filed opposition on September 17, 2009. Having reviewed the briefs and evidence presented by the parties, the court finds that plaintiffs are entitled to attorneys' fees and costs incurred in connection with proceedings related to the government's motion to dissolve the injunction.

## II. DISCUSSION

### A. Legal Standard For Attorneys' Fees Under 28 U.S.C. § 2412

28 U.S.C. § 2412(d)(1)(A) provides:

"Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addi-

11. Plaintiff's Memorandum of Points and Authorities in Support of Motion to Consolidate All Current Provisions of Injunction in a Single Order, Docket No. 849 (Sept. 24, 2007), 4.

12. See Order Granting Motion to Consolidate All Current Provisions of Permanent Injunction in a Single Order, Docket No. 854 (Nov. 26, 2007) at 2–3.

13. *Id.* at 3.

14. *Id.* at 7.

15. *Id.*

16. Notice of Appeal, Docket No. 858 (Jan. 25, 2008) at 1.

tion to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A).

Before fees can be awarded under § 2412(d)(1)(A), (1) the claimant must be a "prevailing party"; (2) the government's position must not have been "substantially justified"; (3) there must be no "special circumstances [that make] make an award unjust"; and (4) a fee application must be submitted to the court within thirty days of final judgment and be supported by an itemized statement. *Commissioner, Immigration and Naturalization Service v. Jean*, 496 U.S. 154, 158, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990); *Krecioch v. United States*, 316 F.3d 684, 687 (7th Cir.2003) ("To be eligible for a fee award under the EAJA, Krecioch must show: (1) that he was a 'prevailing party'; (2) that the Government's position was not 'substantially justified'; (3) that no 'special circumstances make an award unjust'; and (4) that any fee application be submitted to the court within 30 days of final judgment in the action and be supported by an itemized statement"); *Perales v. Casillas*, 950 F.2d 1066, 1072 (5th Cir.1992) ("Eligibility for a fee award under the EAJA requires, at a minimum, that the claimant be a 'prevailing party'; that the Government's position was not 'substantially justified'; that no 'special circumstances make an award unjust'; and that any fee application be submitted to the court within 30 days of final judgment and be supported by an itemized statement").

■ "The party seeking fees has the burden of establishing its eligibility." *Love v. Reilly*, 924 F.2d 1492, 1494 (9th Cir.1991). A plaintiff satisfies the second and third prongs of the test, however, simply by alleging that the government's position was not substantially justified and that no special circumstances exist that make an award unjust. The government then has the burden of proving that its actions were substantially justified in law and fact and/or that special circumstances make awarding fees unjust. *Id.* at 1495 ("The burden of proving the special circumstances or substantial justification exception to the mandatory award of fees under the EAJA rests with the government"); *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 498 (9th Cir.1987) ("the government bears the burden of showing that its position was substantially justified").

## B. Whether Plaintiffs Are Entitled to Attorneys' Fees and Costs under § 2412

### 1. "Prevailing Party"

■ A plaintiff is deemed the "prevailing party" if, as a result of a judgment or consent decree entered in the legal action he or she brought, there is a "material alteration of the legal relationship of the parties." *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 604, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *Miles v. State of California*, 320 F.3d 986, 989 (9th Cir.2003) ("The Supreme Court has squarely held that there is a 'prevailing party' when there has been a 'material alteration of the legal relationship of the parties,'" quoting *Buckhannon*, 532 U.S. at 604, 121 S.Ct. 1835); *id.* at 989 n. 3 ("The Court specifically identified two instances in which a plaintiff can be considered a 'prevailing party': (1) an enforceable judgment on the merits; or (2) an

enforceable court-ordered consent decree").

 Voluntary action by the defendant that is not compelled by a judgment or consent decree does not constitute a "material alteration" in the parties' legal relationship sufficient to support a fee award under *Buckhannon.* *Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835 ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change"); *Watson v. County of Riverside,* 300 F.3d 1092, 1096 (9th Cir.2002) ("*Buckhannon* holds that to be considered a prevailing party, one must have obtained a 'judicial imprimatur' that alters the legal relationship of the parties, such as a judgment on the merits or a court-ordered consent decree; it is not enough merely to have been a 'catalyst' in causing a voluntary change in the defendant's conduct").

The Ninth Circuit has applied the *Buckhannon* rule to applications for fees and costs under the EAJA. *United States v. Campbell,* 291 F.3d 1169, 1172 (9th Cir. 2002) ("In *Perez–Arellano v. Smith,* we adopted the Supreme Court's standard in *Buckhannon,* ruling that a 'prevailing party' under the Equal Access to Justice Act (EAJA) 'must be one who has gained by judgment or consent decree a 'material alteration of the legal relationship of the parties,'" quoting *Perez–Arellano v. Smith,* 279 F.3d 791, 793 (9th Cir.2002)) ("It might be argued that the Supreme Court's *Buckhannon* decision should be viewed as binding precedent only with respect to the statutes there in issue, the FHAA and the ADA, each of which provides attorney's fees for a 'prevailing party' who makes a claim under it.... However, under the circumstances presented here, we discern no reason to interpret the EAJA inconsistently with the Supreme Court's interpretation of 'prevailing party'

in the FHAA and the ADA as explained in *Buckhannon.* We therefore hold that a 'prevailing party' under the EAJA must be one who has gained by judgment or consent decree a 'material alteration of the legal relationship of the parties' ").

The government argues that plaintiffs cannot be deemed "prevailing parties" under *Buckhannon* because the main purpose of the dissolution motion was to secure modification of two paragraphs of the injunction to comply with the expedited removal statute, and this was successfully achieved. Additionally, the government asserts that the law does not support an award of EAJA fees where the parties seeking fees merely defended against dissolution of an injunction, and the opposing party is not required to do anything it was not already obligated to do as a result of the proceeding.

### a. Whether a Party Opposing a Motion to Dissolve an Injunction May Receive EAJA Fees and Costs

The government asserts that plaintiffs are not entitled to attorneys' fees because there has been no "alteration in the legal relationship of the parties." It argues that the only form of relief the court awarded was modifications of the injunction sought by the government and opposed by plaintiffs. Further, it contends that the fact that plaintiffs successfully prevented dissolution of the injunction altogether does mean the "prevailed" because there was no alteration of the parties' legal relationship. Reduced to its essence, the government's argument is that plaintiffs in whose favor a permanent injunction has been entered can never be deemed "prevailing parties" in later proceedings to dissolve the injunction because if they prevail in such proceedings, the parties' legal relationship will not be altered. This proposition is not supported by the law.

The court first dispenses with the government's argument that it should deny plaintiffs' motion because there is no precedent for awarding fees under the EAJA in circumstances such as those presented here. As already noted, the Ninth Circuit applies *Buckhannon* and its progeny to applications for fees and costs under the EAJA. *Campbell,* 291 F.3d at 1172. Accordingly, it is appropriate to look broadly to precedent applying *Buckhannon* rather than solely to cases awarding fees under the EAJA.

As the *Buckhannon* Court made clear, to be a prevailing party, one must obtain relief on the merits in the form of a "court-ordered" change or "judicial imprimatur" that alters the parties' legal relationship. *Buckhannon,* 532 U.S. at 604–05, 121 S.Ct. 1835 (citing *Texas State Teachers Association v. Garland Independent School District,* 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). The entry of a permanent injunction "qualifies as an enforceable judgment on the merits of the case that 'materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiffs.'" *Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville and Davidson County, Tennessee,* 421 F.3d 417, 420 (6th Cir.2005) (quoting *Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)).

Although neither the court nor the parties has identified authority applying *Buckhannon* to subsequent enforcement of a permanent injunction, the parties cite, and the court finds instructive, cases regarding subsequent enforcement of a consent decree.

One court that has considered the government's argument "that [subsequent enforcement proceedings do not effect a] material alteration in the parties' legal relationship" has characterized the conten-

tion as a "red herring." *Grier v. Goetz,* 421 F.Supp.2d 1061, 1072 (M.D.Tenn.2006) ("The crux of this argument lies in the timing of the alteration in the legal relationship"). The government concedes that an alteration in the parties' legal relationship occurred in the 1980's when Judge Kenyon issued the permanent injunction. It argues, however, that maintaining the injunction in place does not lead to a new alteration. Finding that successful defense against certain proposed modifications to a consent decree warranted an award of attorneys' fees, the *Grier* court stated:

> "In the present case, the 'net result' of the litigation is the continued enforcement of many aspects of the 2003 Consent Decree. Even though the material alteration in the legal relationship initially occurred in 2003, that alteration is enforced to this day. Moreover, the Court specifically declined to modify or limit modification of certain provisions of the 2003 Consent Decree to prevent Defendants from returning to pre–2003 Consent Decree activity.... Therefore, in this case, not only did the Court maintain the validity of the 2003 Consent Decree, but it did so because it recognized that the conditions that led to the Decree still exist, and the protections of the Decree continue to be 'essential.'" *Id.*

In this case, it is clear that the government's conduct would be different if it were no longer required to comply with the permanent injunction. The significance of this fact is underscored by *Buckhannon.* There, the Supreme Court distinguished a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit" from orders that placed a judicial imprimatur on such change. *Buckhannon,* 532 U.S. at 605, 121 S.Ct. 1835. The distinction between voluntary and involuntary change is reflected here in

that, had plaintiffs not prevailed in the dissolution proceedings, the parties' legal relationship would have been materially altered, as the government would have ceased to provide the substantial protections of the injunction to class members. It was only because plaintiffs successfully defended the injunction that the government is now forced " 'to do something directly benefitting the plaintiffs that they otherwise would not have had to do.' " *Carbonell v. I.N.S.*, 429 F.3d 894, 900 (9th Cir.2005) (quoting *Richard S. v. Department of Developmental Services*, 317 F.3d 1080, 1087 (9th Cir.2003)).

The principal case on which the government relies is *Alliance to End Repression v. City of Chicago*, 356 F.3d 767 (7th Cir. 2004). *Alliance* raised a procedural issue not present here: whether the wholly unsuccessful defense of a consent decree justified an award of attorneys' fees.[17] The Seventh Circuit did not hold that *Buckhannon* precluded attorneys' fees for a partially successful defense of a consent decree. Rather, as the *Grier* court noted, "the Seventh Circuit took pains to note other cases in which a partially successful defense of a consent decree formed the basis for an award of attorneys' fees." *Grier*, 421 F.Supp.2d at 1073 (citing *Alliance*, 356 F.3d at 769 (in turn citing *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 557–61, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), and *Ustrak v. Fairman*, 851 F.2d 983, 990 (7th Cir.1988)). The Seventh Circuit distinguished these cases from the situation with which it was confronted, i.e., a case in which plaintiffs' efforts to defend a consent decree had not succeeded in any respect, but had utterly failed. *Alliance*, 356 F.3d at 769 ("But those postjudgment proceedings were at least partly successful. These plaintiffs' postjudgment proceedings were not"). See also *id.* at 770 ("[I]n postdecree litigation there may be inevitable setbacks en route to victory, partial or complete. But in the present case there has for a decade now been nothing but loss—a million dollars' worth of legal services poured down the drain. There was not even a disappointing partial success, as there would have been if the City had moved to dissolve the decree and the plaintiffs had fended off dissolution yet had not averted a substantial modification"); *id.* at 773–74 ("In the present case, the circumstances out of which the class action suit had arisen had changed dramatically when modification was sought. The decree in its original form had accomplished its purpose and had become obsolete. There would have been no ignominy in the plaintiffs[ ] acceding to the modification. They might have breathed a sigh of relief, since if the City had asked that the decree be dissolved, it probably would have been. The plaintiffs' opposition to modification gained the class nothing. Section 1988 does not reward failure"). Because this case does not involve the completely unsuccessful defense of an earlier injunctive order, the government's citation of *Alliance* is unavailing.[18]

---

17. The government does not dispute this characterization of the Seventh Circuit's decision. (Govt's Opp. at 14 n. 9 (describing *Alliance* as a case involving a "completely unsuccessful" attempt to defend a consent decree).)

18. The most pertinent observation of the *Alliance* court is its statement that plaintiffs' "strongest claim is to fees for defending the decree against the modification sought by the City. It is strongest because they were responding rather than initiating and because modification is perhaps not as readily conceptualized as a separate suit adventitiously embedded in the underlying class action as is a proceeding for contempt or what we have characterized as a prefiling investigation." *Alliance*, 356 F.3d at 773. As in *Alliance*, plaintiffs here seek fees for defending the permanent injunction against the government's request that it be dissolved or modified.

The Ninth Circuit has held that "a district court has ... discretion to award fees to an original prevailing party who later defends a decree against a collateral attack in a separate action." *San Francisco National Association for the Advancement of Colored People v. San Francisco Unified School District,* 284 F.3d 1163, 1166 (9th Cir.2002). Citing the Supreme Court's decision in *Delaware Valley,* the court held that "work done defending the consent decree" from collateral attack was " 'useful and of a type ordinarily necessary to secure the final result obtained from the litigation.' " *Id.* (quoting *Delaware Valley,* 478 U.S. at 561, 106 S.Ct. 3088). Other circuits concur.

In *Cody v. Hillard,* 304 F.3d 767 (8th Cir.2002), the Eighth Circuit awarded attorneys' fees to a plaintiff who was partially successful defending a consent decree. *Id.* at 775. The court held that the entry of the decree twelve years earlier was "clearly a 'judicially sanctioned' change in the parties' relationship that conferred prevailing party status on the class under *Buckhannon.*" *Id.* at 773 (citations omitted). It acknowledged, however, that merely because the class had "established prevailing party status immediately after entry of a consent decree did 'not make all later work compensable.' " *Id.* Rather, it stated:

"First, the award of fees should take into account the degree of a plaintiffs success in the case as a whole.... Second, an earlier established prevailing party status extends to postjudgment work only if it is a 'necessary adjunc[t] to the initial litigation.' ... Work that is more 'like a new, separate lawsuit' requires a fresh determination of entitlement to fees. The test is whether the later issues litigated were 'inextricably intertwined with those on which the plaintiff prevailed in the underlying suit.' ... Third, plaintiffs cannot overlitigate. Postjudgment litigation, like all

work under the fee-shifting statutes, must be reasonable in degree '[S]ervices that were redundant, inefficient, or simply unnecessary are not compensable.' " *Id.* at 773 (quoting *Jenkins by Jenkins v. State of Missouri,* 127 F.3d 709, 716–18 (8th Cir.1997)) (citations omitted).

See also *id.* at 775 ("When a remedial consent decree is threatened, 'plaintiffs' counsel [are] under clear obligation to make the defensive effort," quoting *Jenkins,* 127 F.3d at 717–18).

In a case decided prior to *Buckhannon,* the Fourth Circuit concluded that once a party had achieved "prevailing party" status by obtaining a consent decree, extending that status to postjudgment litigation turned on the relatedness of the later proceeding to the initial action. *Plyler v. Evatt,* 902 F.2d 273, 280–81 (4th Cir.1990). Where plaintiffs position was "essential to the preservation of the integrity of the consent decree as a whole," and plaintiff was acting "not ... to cure [the decree's] revealed deficiencies, but to preserve its fruits," plaintiff was entitled to "prevailing party" status whether "successful in detail or not." *Id.*

■ All of the various standards that have been articulated—whether the litigation was "useful and of a type ordinarily necessary to secure the final result obtained ...," *San Francisco NAACP,* 284 F.3d at 1166; whether the issues are "inextricably intertwined with those on which the plaintiff prevailed in the underlying suit," *Cody,* 304 F.3d at 773; and whether the subsequent litigation was "essential to the preservation of the integrity of the consent decree as a whole," *Plyler,* 902 F.2d at 280–81—indicate that plaintiffs are entitled to fees in this case. The government sought to dissolve the *Orantes* injunction in its entirety and made no offer to comply voluntarily with any of its provisions. *Buckhannon,* 532 U.S. at 605, 121

S.Ct. 1835 ("A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change"). Where a defendant moves to dissolve a consent decree or permanent injunction, defending against such a motion is sufficiently related to plaintiffs' original success that a successful defense will confer prevailing party status.

### b. Which Party Prevailed in These Proceedings

■ "The key to recovery of attorney's fees is whether the party seeking fees is a 'prevailing' party." *Grier,* 421 F.Supp.2d at 1068. The Supreme Court has held that a prevailing party need not win with respect to each and every issue; rather, prevailing party status can be accorded "when a party has prevailed on the merits of at least some of his claims." *Hanrahan v. Hampton,* 446 U.S. 754, 758, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980) (per curiam). "A typical formulation is that 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe,* 581 F.2d 275, 278–279 (1st Cir. 1978)). Thus, a plaintiff must "receive at least some relief on the merits of his claim before he can be said to prevail." *Hewitt v. Helms,* 482 U.S. 755, 760, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987).

■ The government correctly cites *Garland* for the proposition that the "touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Garland,* 489 U.S. at 792–93, 109 S.Ct. 1486. It overlooks, however, the sentence that follows in the *Garland* opinion: "Where such a change has occurred, the degree of the plaintiff's overall success goes to the reasonableness of the award ..., not to the availability of a fee award *vel non.*" *Id.* at 793, 109 S.Ct. 1486. Notably, in articulating this standard, the Supreme Court rejected the standard adopted by several circuits that plaintiffs must succeed on the "central issue" of the case and obtain the "primary relief sought." *Id.* at 790, 109 S.Ct. 1486. Thus, the government's assertion that it is the prevailing party because it achieved its "principal purpose" in the dissolution proceedings appears to be inapposite. See *Buckhannon,* 532 U.S. at 603–04, 121 S.Ct. 1835 (" 'Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits of at least some of his claims.' Our '[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail,'" quoting *Hanrahan,* 446 U.S. at 758, 100 S.Ct. 1987, and *Hewitt,* 482 U.S. at 760, 107 S.Ct. 2672).

■ The government argues that plaintiffs cannot be considered prevailing parties because the court modified paragraphs 2 and 11 of the injunction, and dissolved two other paragraphs. The government appears to assert that because plaintiffs did not succeed in preventing any modification, they achieved no benefit from their opposition to the government's motion to dissolve. To be deemed the prevailing parties, however, plaintiffs need not succeed in preventing all modifications; they must only succeed in preventing *some* modifications. *Buckhannon,* 532 U.S. at 603–04, 121 S.Ct. 1835.

As the court's recitation of the procedural background of the dissolution litigation demonstrates, it made certain modifications sought by the government, declined to make others, and ultimately denied the government's request that it dissolve the

injunction in its entirety. There is no doubt that plaintiffs succeeded on various significant issues, and achieved some of the benefit they sought in opposing defendants' motion to dissolve. Moreover, the litigation clarified that the injunction applies to Salvadorans detained at ports of entry and that *Orantes* advisals must be provided to these individuals as well as to class members placed in expedited removal between ports of entry.[19]

The government asked that the court bifurcate its request for dissolution of paragraphs 2 and 11 from its request that the remainder of the injunction be dissolved. The court agreed to do so, and on October 11, 2006, issued an order addressing the alleged facial conflict between these paragraphs of the injunction and the expedited removal statute. Although the government now contends that obtaining relief to remedy this conflict was its primary purpose in filing the motion to dissolve, the government persisted in seeking dissolution of all aspects of the injunction once the court had made modifications to address application of the injunction to class members placed in expedited removal. More than eight months after the order regarding the alleged facial conflict was entered, the court denied the government's request to dissolve the injunction. The court did dissolve two paragraphs— one concerning the procedures to be followed before placing a detainee in solitary confinement and one concerning group legal presentations at a detention facility in Texas. The government does not cite the dissolution of these paragraphs as a basis for concluding that it is the prevailing party. Indeed, in maintaining the balance of the injunction, and for the reasons stated in the preceding section, it is clear that plaintiffs prevailed, as they succeeded not only in preventing dissolution of the injunction but in preventing major modifica-

tions as well. *Buckhannon*, 532 U.S. at 603–04, 121 S.Ct. 1835. For purposes of awarding attorneys' fees, therefore, plaintiffs are the prevailing parties, despite the fact that they did not prevail on all issues.

### 2. "Substantially Justified"

■■■■ The court must thus examine whether the government's position was substantially justified to determine whether a fee award under the EAJA is appropriate. In making this determination, the court must consider the totality of circumstances both prior to and during litigation. *Abela v. Gustafson*, 888 F.2d 1258, 1264 (9th Cir.1989). See also *United States v. Marolf*, 277 F.3d 1156, 1161 (9th Cir.2002) (" 'Thus we must focus on two questions: first, whether the government was substantially justified in taking its original action; and, second, whether the government was substantially justified in defending the validity of the action in court.' . . . To prevail here, the government must establish that it was substantially justified on the whole, considering, first, the taking of the Asmara through administrative forfeiture without notice, and, second, continuing to pursue the forfeiture notwithstanding defective notice and expiration of the limitations period"); *Kali v. Bowen*, 854 F.2d 329, 332 (9th Cir.1988) (" 'In analyzing the reasonableness of the government's position under the "totality of the circumstances" test, we must look both to the position asserted by the government in the trial court as well as the nature of the underlying government action at issue,' " quoting *League of Women Voters of California v. FCC*, 798 F.2d 1255, 1258 (9th Cir.1986)). In *Kali*, the court noted that "[t]he inquiry into the nature of the underlying government action will by definition concern only the merits of that action," while "[t]he inquiry into the government's position at trial will encompass" the merits

---

**19.** Pls.' Reply at 3.

of the underlying action "to the extent ... the government chooses to defend" it, as well as "extraneous circumstances bearing upon the reasonableness of the government's decision to" litigate. *Kali,* 854 F.2d at 332.

■ To be substantially justified, "the government's position must have a reasonable basis in law and fact." *Corbin v. Apfel,* 149 F.3d 1051, 1052 (9th Cir.1998) (citing *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). "[A] position can be justified even though it is not correct, and ... it can be substantially (i.e., for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact." *Pierce,* 487 U.S. at 566, n. 2, 108 S.Ct. 2541. " 'The government's position must be "substantially justified" at "each stage of the proceedings.' " " *Corbin,* 149 F.3d at 1052 (quoting *Williams v. Bowen,* 966 F.2d 1259, 1261 (9th Cir.1991)).

■ "That the government lost does not raise a presumption that its position was not substantially justified." *Kunzman,* 817 F.2d at 498. Additionally, that an agency acted contrary to law does not necessarily mean that it lacked substantial justification for the position it took. *Kali,* 854 F.2d at 333.

■ The government bears the burden under the EAJA of establishing that both its conduct giving rise to the litigation and its litigation position were substantially justified. *Li v. Keisler,* 505 F.3d 913, 918 (9th Cir.2007). This burden is met when the government shows that its position "had reasonable basis in both law and fact." *Pierce,* 487 U.S. at 566, 108 S.Ct. 2541; *Ramon–Sepulveda v. INS,* 863 F.2d 1458, 1459 (9th Cir.1988) ("Substantial justification is equated with reasonableness," quoting H.R.Rep. No. 1418, 96th Cong., 2d Sess. 10, reprinted in 1980 U.S.C.C.A.N. 4953, 4989); *Al–Harbi v. INS,* 284 F.3d 1080, 1085 (9th Cir.2002) ("Substantial jus-

tification in this context means justification to a degree that could satisfy a reasonable person").

The Supreme Court has clarified that "substantial justification" for purposes of the EAJA does not mean "justified to a high degree," but rather "justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person." *Pierce,* 487 U.S. at 565, 108 S.Ct. 2541. This formulation "is no different from the 'reasonable basis both in law and fact' formulation adopted by the Ninth Circuit and the vast majority of other Courts of Appeals that have addressed this issue." *Id.* " '[S]ubstantially justified' means, [however,] more than merely undeserving of sanctions for frivolousness; that is assuredly not the standard for Government litigation of which a reasonable person would approve." *Id.*

"In making a determination of substantial justification, the court must consider the reasonableness of both the underlying government action at issue and the position asserted by the government in defending the validity of the action in court." *Bay Area Peace Navy v. United States,* 914 F.2d 1224, 1230 (9th Cir.1990); 28 U.S.C. § 2412(d)(2)(D) (" '[P]osition of the United States' means, in addition to the position taken by the United States in the civil action, the action or failure to act by the agency upon which the civil action is based").

■ Applying these standards, the government will be liable for attorneys' fees to plaintiffs as prevailing parties unless its underlying conduct and litigation position were substantially justified, i.e., had a reasonable basis in law and fact. A finding that either the government's underlying conduct or its litigation position was not substantially justified is sufficient to support a fee award under the EAJA. See *Andrew v. Bowen,* 837 F.2d 875, 880

(9th Cir.1988) ("Since we held that the Secretary's underlying action was not substantially justified, it is not dispositive whether or not the Secretary's litigation position is substantially justified. Thus we decline to reach this issue"). See also *Corbin*, 149 F.3d at 1052 ("The government's position must be 'substantially justified' at 'each stage of the proceedings,'" quoting *Williams*, 966 F.2d at 1261).

Given the Ninth Circuit's mandate that the court consider each stage of proceedings, the court considers separately each phase of the bifurcated dissolution proceedings—first, that stage of the proceedings that addressed the facial conflict between the injunction and the expedited removal statute, and second, the stage during which the government sought dissolution of the injunction in its entirety.[20]

The government argues that it had a reasonable legal basis to seek dissolution of the injunction once Congress enacted the expedited removal statute in 1996.[21] It asserts that the "overlap between the injunction and the statute presented a collage of novel legal questions for the [c]ourt's consideration."[22] Furthermore, it contends, the conflict was so great that "[i]n order to proceed with the full implementation of its [c]ongressional mandate, it was reasonable for the [g]overnment to seek to dissolve the *Orantes* Injunction."[23]

It is true that enactment of the expedited removal statute warranted review of the injunction. Indeed, the court ultimately found, after bifurcating the proceedings to address this narrow issue, that modification of paragraphs 2 and 11 was necessary to remedy the conflict that existed. The government fails to appreciate, however, that the conflict that existed between the injunction and the expedited removal statute warranted only a limited review of the injunction. Passage of the expedited removal statute did not provide a reasonable basis for asking that the court modify provisions that did not conflict with it. Thus, the government's motion to dissolve the entire injunction was not substantially justified by enactment of the expedited removal statute.

The government's present contention that remedying the conflict between the injunction and the expedited removal statute was its "principal purpose in bringing the action" is belied by the manner in which it prosecuted the litigation. After

---

**20.** As noted, the Ninth Circuit has mandated that the court "focus on two questions: first, whether the government was substantially justified in taking its original action; and, second, whether the government was substantially justified in defending the validity of the action in court." *Kali*, 854 F.2d at 332. See also *Gutierrez*, 274 F.3d at 1259 (noting that the government can prevail only if it can show "it was substantially justified on the whole, considering . . . the underlying conduct . . . and . . . its litigation position"). Because plaintiffs did not affirmatively seek to enforce the injunction and alleged non-compliance only defensively, this is not a typical situation in which the government's pre-litigation conduct is relevant. Because it was the government that initiated the action, the pertinent question is whether the government was substantially justified in deciding to move for dissolution of the injunction and in the manner in which it pursued the litigation.

This is not to endorse the government's underlying conduct. Particularly given its dubious interpretation that the injunction applied only to class members detained between ports of entry and not at points of entry, the court has doubts regarding the reasonableness of the government's pre-litigation conduct. Because it finds that the government's litigation position was not reasonable, however, the court need not consider its pre-litigation conduct further.

**21.** Govt.'s Opp. at 16.

**22.** *Id.*

**23.** *Id.* (also stating that the legal issues raised by the conflict "justif[ied] [its] request for reexamination of the entire injunction").

the court modified paragraphs 2 and 11 to remedy the conflict with the expedited removal statute, the government sought to avoid providing discovery on the expedited removal statute and withdrew arguments that "there [was] a facial conflict, that the injunction burden[ed] expedited removal, [and] that expedited removal present[ed] any other reason for dissolving the injunction." [24] If the government's principal purpose in seeking dissolution of the injunction was to remedy conflicts with the expedited removal statute, then once the court modified paragraphs 2 and 11, and the government withdrew its arguments regarding expedited removal, the litigation should have ended. It did not, however, and the government's admission now that it had achieved at that point all it sought to achieve in seeking dissolution of the injunction amounts to a concession that all litigation following those modifications, including the appeal, and all litigation prior to the modifications that concerned other aspects of the injunction or the broader motion to dissolve was not substantially justified. Stated differently, if the government's primary concern was the expedited removal statute, it was not substantially justified in seeking *dissolution* of the entire injunction, as opposed to *modification* of those provisions it believed conflicted with the statute. By seeking dissolution, the government burdened plaintiffs and the court with discovery proceedings, briefing, evidence and argument that was unnecessary to achieve its "principal" [25] or "main" [26] purpose, i.e., resolution of conflicts between the injunction and the statute.

Moreover, as plaintiffs note in their reply, the government lacked substantial justification for bringing a motion premised on conflicts between the expedited removal statute and the injunction because this issue was not raised when the parties held their pre-filing conference under Local Rule 7-3. Plaintiffs contend that "[h]ad the government raised these claims with plaintiffs, rather than concealing them to gain tactical advantage, it is possible the parties could have resolved them without the need for litigation. This is especially true [if,] . . . as defendants now assert, . . . the government's primary goal in bringing the motion was to obtain the relatively minor modifications to paragraphs 2 and 11 of the injunction." [27]

As the Supreme Court stated in *Jean*, "[w]hile the parties' postures on individual matters may be more or less justified, the EAJA . . . favors treating a case as an inclusive whole, rather than as atomized line-items." 496 U.S. at 161–62, 110 S.Ct. 2316. See also, e.g., *Al–Harbi*, 284 F.3d at 1085; *Bay Area Peace Navy*, 914 F.2d at 1230. Here, reviewing the totality of the litigation in light of the government's explanation of its motivation for filing the motion to dissolve reveals the following: Motivated by a desire to secure modification of two paragraphs of the injunction, the government did not discuss the issue with plaintiffs in required meet and confer sessions, did not apprise the court that it sought limited relief, instead moved to dissolve the entire injunction, and upon achieving its "principal purpose," proceeded to litigate whether dissolution of the entire injunction was appropriate, through and including a multi-year appeal.

It is the government's burden to show that it had "a reasonable basis in law and fact" for filing the motion to dissolve. *Pierce*, 487 U.S. at 566 n. 2, 108 S.Ct. 2541.

**24.** Ex Parte Application for Reconsideration of the Court's Ruling on Discovery ("Ex Parte Discovery") at 2.

**25.** Govt.'s Opp. at 16.

**26.** *Id.* at 9.

**27.** Pls.' Reply at 11.

As the government's only argument is that the motion to dissolve was necessary to remedy conflicts between the injunction and the expedited removal statute, and as it is clear that much of the litigation was not necessary to achieve this objective, the court concludes that the government has failed to meet its burden.

Plaintiffs challenge the reasonableness of several of the government's litigation decisions during the dissolution proceedings. They assert, for example, that "by raising new arguments at late stages of the litigation, the government repeatedly caused new rounds of litigation." [28] Plaintiffs also question the reasonableness of the government's opposition to consolidation of the injunctive provisions in a single order,[29] and maintain that its appeal was not substantially justified.

As the government correctly notes, *Jean* directs the court to refrain from this type of "atomized line-item" analysis. The fact that the government made one—or several—unreasonable strategic decisions during the course of the litigation is not determinative of the reasonableness of the government's overall litigation position. The latter is the proper inquiry for EAJA purposes.[30]

The government contends that it had a reasonable factual basis for seeking dissolution of the *Orantes* injunction because in the years following entry of the injunction there had been "sweeping changes in El Salvador and the United States." [31] In particular, the government cites the "overarching structural reforms" in its immigration processes, and the "eighteen-year lack of enforcement proceedings," and notes that the court found this evidence "compelling" and "persuasive." [32] The government also contends that the court carefully examined evidence of changed conditions in El Salvador and found the changes "highly persuasive." [33] Finally, the government asserts the fact that "detention conditions ha[ve] changed substantially as well" provides a further reasonable basis in fact for filing the motion to dissolve. Taken as a whole, the government argues it demonstrated that there had been "significant changes in fact," and that the court "weigh[ed those

**28.** Motion for Attorneys' Fees at 13; see also *id.* at 8 ("This round of briefing was completely unnecessary, and the government's position was contrary to the prior rulings of the Court, as the Court confirmed in resolving the dispute in a November 13, 2006 order").

**29.** Pls.' Reply at 10.

**30.** To be sure, the reasonableness of several of the government's strategic decisions can be questioned. Plaintiffs contend, for example, that the government forced relitigation, in two rounds of further briefing, its obligation to give advisals to Salvadorans placed in expedited removal. (Pls.' Reply at 15; Motion for Attorneys' Fees at 8 ("In [the October 26, 2006] ruling, the Court found that the government's positions were 'at odds with the October 11, 2006 order,' and that '[a]ny confusion regarding the Court's intent ought to have been dispelled by its October 26, order denying the government's *ex parte* application for clarification,'" quoting the court's Minute Or-

der issued November 13, 2006).) The court, moreover, expressed frustration with the government's conduct at various stages of the proceedings. After the government misstated, and then clarified, whether it placed Salvadorans in expedited removal, for example, the court noted that it was "distressed to see that certain representations were made by the government at the time of the last hearing ... [had] apparently ... prove[d] to be untrue" The court also observed that the government seemed intent on "prohibit[ing] at all costs any provision of information to the plaintiffs regarding expedited removal or how that may affect Salvadorans." (Reporter's Transcript of Proceedings, January 13, 2006, quoted in Motion for Attorneys' Fees at 4.)

**31.** Govt.'s Opp. at 17.

**32.** *Id.*

**33.** *Id.*

changes in assessing] the extent to which the[y] ... warranted dissolution or modification of the injunction"[34] on the basis that "it had outlived its usefulness."[35]

Plaintiffs counter that the court's order granting in part and denying part the government's motion to dissolve the injunction catalogues a history of non-compliance with the terms of the injunction.[36] Plaintiffs note that the court found "a significant number of violations of critical provisions of the injunction," *Orantes IV*, 504 F.Supp.2d at 875, and that it gave "considerable weight to evidence suggesting that the facility reviews ha[d] understated— perhaps severely—violations of the standards at the various detention centers." *Id.* at 873. With respect to advisals at the ports of entry, the court found:

"The government's interpretation of the injunction was not so unreasonable, however, as to have justified contempt sanctions, had plaintiffs sought them. Rather, the fact that the injunction used terms that related only to proceedings between ports of entry compels the conclusion that, at least initially, the government did not violate the letter of the

order by failing to give advisals to Salvadorans at ports of entry. Once IIRIRA passed, however, the injunction used terms that no longer had legal meaning, and the government should have sought clarification from the court. The government's narrow interpretation of the injunction in the first instance, and its failure to obtain clarification once the distinction between deportation and exclusion proceedings was eliminated, cast doubt on the government's assertion that it has complied with the injunction in good faith and reformed its practices to ensure that all aliens receive notice of their rights." *Id.* at 851.

Moreover, the court noted that the government had failed to adduce any evidence that Form I–826, which advises aliens of their right to apply for asylum and upon which the government relied as evidence of changed factual circumstances, was ever given to aliens.[37] *Id.* at 853.

■ The government either knew that it was not complying with many provisions of the *Orantes* injunction when it brought the motion to dissolve, or failed to investigate its record of compliance or non-com-

---

34. *Id.* at 18.

35. *Id.* at 17. As with other aspects of the court's order declining to dissolve the injunction, the government seeks to relitigate the court's findings regarding detention conditions. The government argues that the court did not find that detention center violations affected Salvadorans. As a threshold matter, this appears to be an attempt to shift the burden to plaintiffs to identify violations. The Ninth Circuit, however, held that "[t]he government's assertion that plaintiffs bear the burden of proving noncompliance is incorrect, and the government fails to cite any supporting authority" for it. *Orantes V*, 321 Fed.Appx. at 628. In any event, the court's review of detention conditions demonstrated that violations of the injunction were widespread, and the government presented no evidence that Salvadorans were segregated sufficiently that they were immune from such

widespread noncompliance. *Orantes IV*, 504 F.Supp.2d at 872–74 ("In concluding that the number of violations is significant, the court gives considerable weight to evidence suggesting that the facility reviews have understated—perhaps severely—violations of the standards at the various detention centers"); *id.* at 875 (noting "evidence that at detention facilities for which reports were produced there have been a significant number of violations of critical provisions of the injunction dealing with detainees' access to legal materials, telephone use, and attorney visits").

36. Motion for Attorneys' Fees at 12.

37. The parties vigorously disputed the adequacy of the advisals provided in Form I–826. The court, however, declined to decide the issue, given the lack of evidence that the form was provided to aliens. *Orantes IV*, 504 F.Supp.2d at 853.

pliance. Detailed factual investigation is a prerequisite to bringing a motion based on changed factual circumstances. Cf. *United States v. $12,248 U.S. Currency*, 957 F.2d 1513, 1518 (9th Cir.1991) (affirming an EAJA fee award because, despite an earlier finding of probable cause, the government unreasonably delayed in pursuing a forfeiture action and conduct no investigation of claimant's case during the period of delay, demonstrating that its position was not substantially justified). When the government moves to dissolve an injunction, which requires an affirmative showing of changed factual circumstances, substantial justification requires more than just a good faith belief in the merit of its position; it requires that the government examine the evidence within its control to determine whether it is or is not in compliance with the terms of the injunction. See, e.g., *Taylor v. United States*, 815 F.2d 249, 254 (3d Cir.1987) (Becker, J., concurring) ("... we are not denying attorney's fees because of the government's good faith. Good faith or laudatory motives are not a defense to an EAJA claim"); *Truckers United for Safety v. Mead*, 201 F.Supp.2d 52, 56 (D.D.C.2002) ("... the Government's arguments that its 'good faith belief equates to substantial justification of its actions and that the decisions of other courts provide substantial justification are without merit'"), rev'd on other grounds, 329 F.3d 891 (D.C.Cir.2003). Cf. *Pierce*, 487 U.S. at 563, 108 S.Ct. 2541 ("to

be 'substantially justified' means, of course, more than merely undeserving of sanctions for frivolousness"). Given the evidence of noncompliance that was revealed through discovery of information within the government's control, the court cannot find that the government was substantially justified in asserting compliance as a changed circumstance.

At oral argument, the government asserted that it was substantially justified in moving the dissolve the injunction because many years had passed since the end of the civil war in El Salvador in 1991, the passage of the expedited removal statute in 1996, and the promulgation of national detention standards in 2000. It argued that it had delayed filing the motion to allow the situation to "coalesce" and to ensure that it was in compliance with the injunction. The government also represented that it had engaged in a six month investigation prior to filing a motion to dissolve the injunction. Despite its purported investigation, however, the government did not adduce sufficient evidence of compliance to support its motion. This suggests either that the government's investigation was inadequate, or that the government was on notice prior to filing the motion to dissolve that it would be unable to demonstrate substantial compliance with the terms of the injunction. Whichever may be the case, the record does not support a finding of substantial justification.[38]

---

**38.** The government also argues that compliance is but one factor in evaluating whether it is proper to dissolve an injunction, and implicitly suggests that it was substantially justified in seeking to dissolve the injunction due to changed circumstances even if it was not in substantial compliance with the injunction. This is not the case. The Ninth Circuit affirmed the court's decision to preserve the injunction based primarily on the government's noncompliance. Although the Ninth Circuit concluded, as did this court, that country conditions in El Salvador had

changed, it noted that the government could not establish changed circumstances with respect to its "pattern of interference with class members' rights to apply for asylum." *Orantes V*, 321 Fed.Appx. at 628. As respects the advisals and detention conditions, the only evidence the Ninth Circuit cited was the government's pattern of noncompliance. *Id.* at 628–29. The government's argument that it was substantially justified in seeking to dissolve the injunction whether or not it was in compliance with the injunction is therefore

The government also urged at oral argument that the court consider the Seventh Circuit's recent decision in *Potdar v. Holder*, 585 F.3d 317 (7th Cir.2009). There, the Seventh Circuit noted that to be substantially justified, "the Government's position must be 'justified in substance or in the main' or 'justified to a degree that could satisfy a reasonable person.'" *Id.* at 319 (quoting *Pierce*, 487 U.S. at 565, 108 S.Ct. 2541). The court emphasized that the government can meet this burden by showing that "(1) it had a reasonable basis in truth for the facts alleged, (2) it had a reasonable basis in law for the theory propounded, and (3) there was a reasonable connection between the facts alleged and the theory propounded." *Id.* (quoting *Kholyavskiy v. Holder*, 561 F.3d 689, 691 (7th Cir.2009) (emphasis supplied)). This test does not assist the government. If, as it represented at oral argument, the government undertook an investigation prior to filing the motion to dissolve, and uncovered evidence of non-compliance, its motion lacked a reasonable basis in fact. If, on the other hand, the government developed evidence of compliance that it failed to share with the court, then the government fundamentally misunderstood its legal burden in seeking to dissolve the injunction. Neither possibility demonstrates that the government was justified in pursuing dissolution to a degree that would satisfy a reasonable person.

There is no doubt that the government was justified in asserting changed factual circumstances with respect to conditions in El Salvador. As respects changed conditions in its detention facilities, and structural reforms in immigration processes, however, the government lacked substantial justification in fact. Additionally, the court cannot find that the government has met its burden of showing that it had a substantial legal justification for moving to dissolve the injunction. The legal justification it has offered—conflicts between the injunction and the expedited removal statute—simply does not support the scope of litigation the government undertook. Having carefully examined the merits of the government's case and the totality of the circumstances, the court finds that the government's decision to initiate and prosecute dissolution proceedings was not substantially justified.

### 3. "Special Circumstances"

The court may also decline to award plaintiffs attorneys' fees if it finds that "special circumstances make an award unjust." See 28 U.S.C. § 2412(d)(1)(A). The Ninth Circuit has held that special circumstances are present when the government argues for "a novel but credible extension or interpretation of the law," *Hoang Ha v.*

without merit, given that compliance is an important and often dispositive factor in deciding whether to lift an injunction. *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 249, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) ("A district court need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future. But in deciding whether to modify or dissolve a desegregation decree, a school board's compliance with previous court orders is obviously relevant"); *SEC v. Coldicutt*, 258 F.3d 939, 942–43 (9th Cir.2001) (examining defendant's record of compliance with an injunction restraining her from violating §§ 5(a) and 5(b) of the Securities Act to determine whether she might violate the statutes if the injunction were dissolved); *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 36–37 (D.C.Cir.2000) (indications that defendants had continued their unfair labor practices, even after the entry of a consent decree, counseled against dissolution, since "the reduction in violation frequency might be a reflection of the effectiveness of the prospective fine schedule contained in the consent order rather than a result of good intentions on the company's part").

*Schweiker*, 707 F.2d 1104, 1106 (9th Cir. 1983), when its action concerns an issue on which "reasonable minds could differ," *League of Women Voters*, 798 F.2d at 1260, or when the action involves an "important and doubtful question," *Minor v. United States*, 797 F.2d 738, 739 (9th Cir. 1986).[39]

■■■ The government argues, without citation to authority, that the following three circumstances justify a finding that an attorneys' fee award would be unjust: "(1) the Government [w]as the party bringing an action to dissolve a long-standing injunction; (2) novel arguments requiring analysis of the intersection between the expedited removal statute and the *Orantes* Injunction [existed], and (3) novel factual circumstances compell[ed] examination of whether the injunction had outlived its usefulness."[40]

■■■ "The burden of proving the special circumstances ... exception to the mandatory award of fees under the EAJA rests with the government." *Love*, 924 F.2d at 1495. "Th[e] [special circumstances] provision, [moreover,] should only be invoked with caution." *Lucas v. White*, 63 F.Supp.2d 1046, 1056 (N.D.Cal.1999). Considering the "special circumstances" exception to an award of fees under 42 U.S.C. § 1988, the Ninth Circuit has cautioned that a district court "cannot deny a motion for fees solely because the statute grants [it] discretion to do so." *Herrington v. County of Sonoma*, 883 F.2d 739,

744 (9th Cir.1989). "Instead, [it] must articulate reasons for any departure from the general rule that prevailing parties are to be awarded fees, identifying any special circumstances and explaining why they render an award unjust." *Id.* The defendant bears the burden of showing special circumstances warranting a denial of fees, "and the defendant's showing must be a strong one." *Id.*

The gravamen of the second and third circumstances the government cites as justification for the denial of attorneys' fees is that the case raised questions of first impression.[41] In *Gutierrez v. Barnhart*, 274 F.3d 1255 (9th Cir.2001), the Ninth Circuit considered and rejected just such an argument. It noted that "[w]hether a litigated issue is one of first impression is properly considered as one factor in determining whether the government's litigation position is substantially justified, not as a special circumstance justifying the refusal of an award of fees." *Id.* at 1260. See also *Kali*, 854 F.2d at 332 n. 2 ("The court's observation that the Ninth Circuit had not yet addressed the issue was an appropriate component of the inquiry into substantial justification"). Second, the court observed, "there is no per se rule that EAJA fees cannot be awarded where the government's litigation position contains an issue of first impression." *Gutierrez*, 274 F.3d at 1260.

The court has already considered the government's argument regarding the ex-

---

**39.** These three cases are cited in *United States v. Gavilan Joint Community College Dist.*, 849 F.2d 1246, 1249 (9th Cir.1988).

**40.** Govt.'s Opp. at 22.

**41.** The court does not fully understand the import of the first special circumstance the government identified—that it brought a motion to dissolve a longstanding injunction. The government appears to suggest that whenever it seeks to dissolve an injunction,

this is a special circumstance that warrants denial of fees under the EAJA. Since the EAJA applies *only* when the government is a party, the assertion appears circular. To the extent the government relies on the length of time the injunction was in place, it fails to explain how the age of the injunction affects the justice of an attorneys' award. In this case, despite the age of the injunction, the government could not demonstrate that it was in compliance with the decree.

pedited removal statute in evaluating whether its position in this litigation was substantially justified. The government fails to explain why it would be equitable to deny fees where the government includes a single meritorious and novel issue in a motion raising many other issues, succeeds in part on the novel issue, and continues to litigate the rest of the motion to an unsuccessful conclusion. If this were the rule, the government could immunize itself from the payment of fees in myriad disputes where its litigation posture was not otherwise substantially justified. This would not only be unjust, but would run counter to the Ninth Circuit's perspective in *Gutierrez.* See 274 F.3d at 1261 ("Ultimately, the government 'urges that every case of first impression must constitute special circumstances' justifying a refusal to award costs under the EAJA. We disagree").[42]

For the first time at oral argument, the government asserted that under the rule articulated in *Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), it had an affirmative duty to seek dissolution of an institutional reform injunction. Having reviewed the *Dowell* decision once again, the court finds no language in it that supports the government's reading of the case. *Dowell* did not address obligations of the government, but rather the obligation of the courts under separation of powers principles to dissolve injunctions that have outlived their usefulness. The Court stated:

> "The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a viola-

tion of the Constitution by the local authorities. Dissolving a desegregation decree after the local authorities *have operated in compliance with it for a reasonable period of time* properly recognizes that 'necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination.'" *Dowell,* 498 U.S. at 248, 111 S.Ct. 630(quoting *Spangler v. Pasadena City Board of Education,* 611 F.2d 1239, 1245 n. 5 (9th Cir.1979) (Kennedy, J., concurring) (emphasis supplied)).

*Dowell* in fact supports the proposition that dissolution of an injunction, even one that is highly invasive of the enjoined party and implicates important institutional values, should not be granted until the government has operated in compliance with it for a reasonable period of time. Here, the government failed to adduce evidence of substantial compliance.

▬▬▬ At oral argument, the government also raised for the first time the proposed special circumstance that extra burdens attached because it has had to apply different detention standards and give different advisals to Salvadorans than other aliens. This argument is puzzling. Throughout the litigation, the government asserted that it was in compliance with the injunction because it had implemented national detention standards that were more protective of Salvadorans' rights than those mandated by the injunction. The government stressed repeatedly that these standards were applicable to all aliens.

---

**42.** The court disagrees with the government that whether the injunction had outlived its usefulness was a novel factual circumstance. There is a clearly articulated, if difficult to apply, standard governing the dissolution of injunctions. If it were a novel question whether an injunction had outlived its usefulness, there would be a "special circumstance" precluding an award of fees in every proceeding to dissolve an injunction in which the government was involved.

The government also asserted that it was giving all aliens, including Salvadorans, a form that incorporated the *Orantes* advisals. If this is true, it undercuts almost completely the government's argument regarding burden. Moreover, absent evidence that the government has substantially complied, the court cannot conclude that it is burdened by compliance.

In sum, the government has not met its burden of proving that special circumstances make an award of attorneys' fees unjust.

### 4. Conclusion Regarding Entitlement to Fees

Because plaintiffs prevailed on significant issues in the litigation, and because the government has not shown that its litigation of the motion to dissolve was substantially justified or that special circumstances render an award of attorneys' fees unjust, plaintiffs are entitled to fees. The court thus turns to the amount of the fee award.

### C. The Amount of Fees

In *Pierce*, 487 U.S. 552, 108 S.Ct. 2541, the Supreme Court observed that

"the EAJA provides that attorney's fees 'shall be based upon prevailing market rates for the kind and quality of the services furnished,' but 'shall not be awarded in excess of [$125 adjusted for inflation] per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.'" *Id.* at 571, 108 S.Ct. 2541 (citing 28 U.S.C. § 2412(d)(2)(A)).[43]

### 1. Special Factor Enhancement

The *Pierce* Court noted that "the 'special factor' formulation suggests Congress thought that [$125] an hour was generally quite enough public reimbursement for lawyers' fees...." *Id.* at 572, 108 S.Ct. 2541. Thus, special factors cannot be "of broad and general application.... The 'novelty and difficulty of issues,' 'the undesirability of the case,' 'the work and ability of counsel,' and 'the results obtained' are factors applicable to a broad spectrum of litigation; they are little more than routine reasons why market rates are what they are." *Id.* at 573, 108 S.Ct. 2541. Similarly, "local or national market" rates, the "general legal competence" of counsel, and customary fees and awards are not special factors. See *id.* at 572–73 & n. 3, 108 S.Ct. 2541. Instead, the Court stated, the statute's reference to "the limited availability of qualified attorneys for the proceedings involved" means "attorneys having some distinctive knowledge or specialized skill needful for the litigation in question," e.g., attorneys who have "an identifiable practice specialty such as patent law, or knowledge of foreign law or language." *Id.* at 573, 108 S.Ct. 2541.

Thus, "[e]nhanced hourly rates based on the special factor of the limited availability of qualified attorneys for the proceedings involved may be awarded under EAJA where the attorneys possess 'distinctive knowledge' and 'specialized skill' that was 'needful to the litigation in question' and 'not available elsewhere at the statutory rate.'" *Nadarajah v. Holder*, 569 F.3d 906, 912 (9th Cir.2009) (quoting *Thangaraja v. Gonzales*, 428 F.3d 870, 876 (9th Cir.2005)). See also *Pirus v. Bowen*, 869 F.2d 536, 541–42 (9th Cir.1989) ("It is not enough, however, that the attorney possess distinctive knowledge and

---

**43.** At the time *Pierce* was decided, the cap set by 28 U.S.C. § 2412(d)(2)(A)(ii) was $75 per hour.

skills. Those qualifications warrant additional fees only if they are in some way needed in the litigation and cannot be obtained elsewhere at the statutory rate"). The court considers each element of this standard in turn.

### a. Distinctive Knowledge and Skill

██ The Ninth Circuit has recognized that attorneys may demonstrate "distinctive knowledge and specialized skill in immigration law and, in particular, constitutional immigration law and litigation involving the rights of detained immigrants." *Nadarajah*, 569 F.3d at 912. See also *Fang v. Gonzales*, No. 03–71352, 2006 WL 5669901, *3 (9th Cir. Oct. 30, 2006) (Unpub. Disp.) ("Counsel Smith's specialized skills and distinctive 'knowledge of ... particular, esoteric nooks and crannies of immigration law,' as established by the affidavit and a review of the case file, enabled her to address effectively in the briefs and at oral argument the application of two complicated state and federal statutory schemes and to succeed in obtaining relief from removal for Fang," quoting *Muhur v. Ashcroft*, 382 F.3d 653, 656 (7th Cir.2004)). In Nadarajah, the Ninth Circuit analyzed the qualifications of three of the attorneys who represented plaintiffs in this litigation and awarded them attorneys' fees at market rates.[44]

---

44. Because the Ninth Circuit has considered the qualifications of these attorneys at length, the court adopts the appellate court's evaluation of their qualifications:

"[Judy] Rabinovitz's declaration states that she is a 1985 graduate of New York University Law School and, since 1988, a staff attorney at the ACLU Immigration Rights Project in New York. Nadarajah contends that Rabinovitz is 'the leading attorney in the nation litigating cases involving the rights of detained immigrants [and] has litigated numerous cases involving the prolonged detention of immigrants throughout the federal judiciary.' Nadarajah cites four significant immigration detention cases where Rabinovitz was lead counsel and achieved favorable outcomes.

[Ahilan] Arulanantham's declaration states that he is a 1999 Yale Law School graduate who clerked for a Ninth Circuit judge, has specialized in the rights of detained immigrants as an ACLU staff attorney for more than four years, and represented detained immigrants in criminal proceedings as a federal public defender for two years. Nadarajah cites eight important cases in which Arulanantham represented the immigrant or appeared on behalf of amicus curiae.

Nadarajah contends that [Ranjana] Natarajan has represented non-citizens detained under the immigration laws for four years, citing four immigration cases in which Natarajan has appeared. Nadarajah also contends that Natarajan was named one of the top 100 women lawyers in California by California Lawyer magazine in 2005. According to the internet, Natarajan is a 1999 graduate of Columbia Law School.

Nadarajah's contentions are corroborated by the declarations of a San Francisco immigration specialist, Marc Van Der Hout, Esq., and a Los Angeles attorney and former ACLU Senior Staff Counsel, Carol A. Sobel, Esq. Van Der Hout states that he is familiar with the experience and expertise of all three attorneys and, in his opinion, they all possess "discrete and complex knowledge." He has been aware of Rabinovitz's work for nearly 20 years, and she is one of the leading immigrants' rights lawyers in the country. He has been aware of Arulanantham's and Natarajan's work for the past several years and is very familiar with their work over the past two years, during which they have successfully litigated several cases involving the prolonged detention of immigrants. Van Der Hout has co-counseled several complex immigration cases involving national security issues with Arulanantham and Natarajan, and therefore he is familiar with the excellent quality of their written work and advocacy. Sobel states that she is very familiar with Arulanantham's and Natarajan's skill, experience, and reputation, having worked with them as co-counsel on a number of cases during the past several years. In her opinion, both Arulanantham and Natarajan enjoy exceptional reputations as attorneys and display skills and experience far beyond those of most attorneys who have been

Plaintiffs' lead' counsel is Linton Joaquin. Joaquin's declaration states that he is a 1976 graduate of the University of California at Berkeley and he has been employed since 1990 at the National Immigration Law Center ("NILC") where he is currently the general counsel. Prior to joining the NILC, Joaquin worked as a litigation attorney and ultimately the executive director of the Central American Refugee Center. Joaquin has served as counsel for plaintiffs since 1982 and as lead counsel since 1989. The focus of Joaquin's practice is immigration law and related federal court litigation. Judge Kenyon awarded Joaquin attorneys' fees under the EAJA at market rates in 1994 because of his specialized knowledge in immigration law.[45] Given his extensive knowledge of this case and his thirty years' experience litigating immigration cases, Joaquin has distinctive knowledge and skill in the area of immigration law.

Attorneys Jennifer Chang Newell, Karen Tumlin, and Monica Ramirez have less experience than Rabinovitz, Arulanantham, Nadarajah and Joaquin. Tumlin is a 2004 graduate of the University of California at Berkeley who has been employed at NILC since October 2005. he is teaching immigration law during the 2009–2010 school year at Loyola School of Law and has served as lead or principal co-counsel in two complex immigration class action suits and several other general immigration suits.[46] Newell is a 2003 graduate of Stanford Law School and has been employed at the American Civil Liberties Union Immigrants' Rights Project ("ACLU IRP") since 2004. She reports that she has particular expertise gained litigating cases involving the due process rights of non-citizens, political asylum, federal jurisdiction in immigration cases, and expedited removal. She has participated as a faculty member in immigration law training sessions for staff attorneys of the United States Courts of Appeals.[47] Ramirez is a 2004 graduate of Stanford Law School and has been employed at the ACLU IRP since 2005. She has litigated various immigration matters since 2005.[48] Ramirez is a fluent Spanish speaker and used her language skills in preparing the client declarations that were submitted as evidence in this case.[49]

Although Mark Rosenbaum has not specialized in immigration litigation, he has experience in immigration and complex civil litigation. Plaintiffs note that Rosenbaum brings unique experience in that he served as lead counsel for plaintiffs during the 1985–87 trial. Given his role in the original proceedings before Judge Kenyon, Rosenbaum developed extensive knowledge of the processing and detention practices that led to issuance of the permanent injunction.[50] He is a 1974 graduate of Harvard Law School and has since worked for the ACLU Foundation of Southern

practicing for seven years. As a former ACLU staff attorney, Sobel is also familiar with Rabinovitz.

Although Sobel has never worked with Rabinovitz on a case, Sobel is aware that Rabinovitz 'enjoys an exceptional reputation in the area of immigration law.' " *Nadarajah*, 569 F.3d at 912–13.

**45.** Declaration of Linton Joaquin ("Joaquin Deck"), ¶¶ 1–10.

**46.** Declaration of Karen Tumlin ("Tumlin Deck"), ¶¶ 1–16.

**47.** Declaration of Jennifer Chang Newell ("Newell Decl."), ¶¶ 1–8.

**48.** Declaration of Monica Ramirez ("Ramirez Decl."), ¶¶ 1–8.

**49.** Motion for Attorneys' Fees at 17.

**50.** *Id.* at 18; Declaration of Mark D. Rosenbaum ("Rosenbaum Decl."), ¶¶ 1–8.

California. He has been its Legal Director since 1994.[51]

Immigration law is a practice specialty that requires distinctive knowledge and special skill. Plaintiffs have presented evidence that many of their attorneys specialize in this area, and thus possess special knowledge, skill and expertise. They have also proffered evidence that certain of their attorneys, by virtue of their long involvement in this litigation, possess distinctive knowledge crucial to litigation of this complicated case. The government does not dispute that plaintiffs' counsel possess distinctive knowledge and special skills.

### b. Needful for Litigation in Question

The Ninth Circuit has awarded enhanced attorneys' fees based on specialized knowledge of immigration law in cases which "involved more than established principles of law with which the majority of attorneys are familiar." *Nadarajah*, 569 F.3d at 914. See also *id.* at 913 (noting that the Seventh Circuit has enhanced rates where counsel established that "knowledge of foreign cultures or of particular, esoteric nooks and crannies of immigration law ... [was] needed to give the alien a fair shot at prevailing," quoting *Muhur*, 382 F.3d at 655–56).

■ Plaintiffs assert that this litigation required counsel with distinctive knowledge and experience of immigration law, immigration processing and enforcement procedures, and immigrants' rights litigation. The case required extensive briefing regarding the Immigration and Nationality Act ("INA"), in that the government asserted that five different provisions of that act precluded the court's consideration of issues related to expedited removal. Plaintiffs also maintain that the case required extensive experience and familiarity with removal processing procedures and detention policies and practices, given that counsel were required to investigate problems in the field, review discovery information, and present evidence to the court to counter the government's claims that its forms, policies, and guidelines had obviated the need for the injunction to remain in effect.[52]

While the government concedes that the action arose in the context of immigration law and concerned immigration detention practices, it contends that none of the issues raised was so complicated that it required distinctive knowledge or specialized skill. In the government's view, the case required briefing regarding jurisdictional issues, discovery matters, and the rules surrounding dissolution of an injunction.[53]

The Ninth Circuit has declined to "award[ ]enhanced hourly rates in immigration cases pursuant to the statutory exception for limited availability of qualified attorneys where the litigation in question required no 'distinctive knowledge' or 'specialized skill.' " *Thangaraja*, 428 F.3d at 876. *Ramon–Sepulveda*, the sole case on which the government relies, noted that plaintiff's "legal claim against the INS involve[d] established principles of res judicata-principles with which the majority of attorneys are, or should be, familiar. Additionally, there is no shortage of attorneys in Los Angeles qualified to assist aliens in deportation proceedings." *Ramon–Sepulveda*, 863 F.2d at 1463. See *Thangaraja*, 428 F.3d at 876 (declining to apply an upward adjustment for representation of an alien in connection with the review of a Board of Immigration Appeals decision regarding applications for asylum and withholding of removal); *Rueda–Men-*

---

**51.** Rosenbaum Decl., Exh. B.

**52.** Motion for Attorneys' Fees at 18–19.

**53.** Govt's Opp. at 26.

icucci v. I.N.S., 132 F.3d 493, 496 (9th Cir.1997) (holding that no specialized skill or distinctive knowledge was needed to represent an alien at asylum and withholding of deportation hearings); see also *Johnson v. Gonzales,* 416 F.3d 205, 213 (3d Cir.2005) ("Although Johnson's counsel is an experienced attorney who specializes in immigration, he was here faced with a case of straightforward application of the substantial evidence and asylum standards").

*Ramon–Sepulveda* is not controlling, as it involved straightforward representation of a single alien in a deportation proceeding. While such a representation may prove to be sufficiently complex to warrant enhanced fees, *Freeman v. Mukasey,* No. 04–35797, 2008 WL 1960838, *4–5 (9th Cir. Feb. 26, 2008) (Unpub.Disp.) (awarding enhanced fees in a case raising matters of first impression in the circuit regarding the interplay between the adjustment of status regime and the visa waiver program, and "present[ing] thorny procedural and jurisdictional questions because [the alien] had left the country and because the proper venue for review of her claims was not clear until passage and interpretation of the REAL ID Act"); *Fang v. Gonzales,* No. 03–71352, 2006 WL 5669901, *3 (9th Cir. Oct. 30, 2006) (Unpub.Disp.) (holding that specialized skill and distinctive knowledge of immigration law was required to "address effectively in the briefs and at oral argument the application of two complicated state and federal statutory schemes and to succeed in obtaining relief from removal for" alien), there can be no dispute that the issues presented in this action were substantially more complex than representation of a single alien. The case is, in the court's view, more analogous to *Nadarajah*. There, the government contended that no distinctive knowledge or special skill was required because the litigation "involved the application of the immigration detention statutes, Supreme Court precedent, and an understanding of

constitutional law, but turned on statutory interpretation and did not involve the application of complex statutes or regulations." *Nadarajah,* 569 F.3d at 913–14. The court concluded, however, that the "case involved more than established principles of law with which the majority of attorneys are familiar." *Id.* at 914 (citing *Ramon–Sepulveda,* 863 F.2d at 1462–63). It described the litigation as "an unusual and complex case which required a 58–page brief and resulted in a significant 15–page published decision that is cited thus far in more than 70 other cases and 20 treatises or articles." Litigation of the *Orantes* injunction before the district court alone involved multiple hearings and hundreds of pages of briefing; five separate written orders were issued which cumulatively totaled more than 140 pages. The case resulted in a published district court opinion that was subsequently affirmed by the Ninth Circuit. The injunction upheld in the opinion affects not just a single alien, as do the cases cited by the government. Rather, it has nationwide significance.

The *Nadarajah* court distinguished past decisions in this and other circuits that had denied an enhancement on the basis that the action before it "did not involve merely a 'straightforward application' of the rules of immigration law and appellate practice." *Id.* (quoting *Thangaraja,* 428 F.3d at 876). In assessing the complexity of the litigation, the Ninth Circuit credited the declaration of an immigration law expert, Marc Van Der Hout. Van Der Hout has submitted a declaration in this case as well, which states:

"I am very familiar with the *Orantes* case and have been for the more than two decades that this case has been litigated. In fact, I represented plaintiff[s] in settling the attorneys' fees claims for the earlier phase of the litigation, in 1991. This case, involving the

government's effort to dissolve a nation-wide permanent injunction, raised unique and complex issues of immigration law. Specifically, because of the government's claims that the *Orantes* injunction conflicted with the expedited removal statute, plaintiffs' counsel needed to use the specialized knowledge that they have of the judicial review limitations of the Immigration and Nationality Act and the expedited removal statute. Plaintiffs' counsel also needed to have a thorough understanding of immigration arrest and processing procedures, immigration detention practices and procedures, and the extensive factual records that led to the issuance of the nationwide injunction in this case. Only attorneys with distinctive knowledge and exemplary skills in these areas could have successfully litigated this case. It is my opinion that Linton Joaquin, Karen Tumlin, Ranjana Natarajan, Mark Rosenbaum, Judy Rabinovitz, Jennifer Newell, and Monica Ramirez possess such knowledge and skills and that those skills were absolutely necessary to the successful resolution of this litigation." [54]

The court finds Van Der Hout's declaration as credible here as the Ninth Circuit did in *Nadarajah.* His description of the action, moreover, is entirely consistent with the court's knowledge and impressions of litigation surrounding dissolution of the injunction.

In sum, plaintiffs have "demonstrate[d] and a review of the briefs and opinion confirms that here, unlike in *Thangaraja,* 'knowledge of ... particular, esoteric nooks and crannies of immigration law ... [was] needed to give the alien a fair shot at prevailing.'" *Nadarajah,* 569 F.3d at 915 (quoting *Thangaraja,* 428 F.3d at 876). This litigation was, if anything, broader in scope and significance and of greater com-

plexity than Nadarajah. Plaintiffs have therefore met their burden of showing that counsel with distinctive knowledge and specialized skill were needed.

### c. Not Available in the Market at Statutory EAJA Rates

■ Plaintiffs must also show that qualified attorneys were not available to handle this litigation at the statutory maximum hourly rate. See *United States v. Real Property Known as 2224 Dolorosa Street,* 190 F.3d 977, 984 (9th Cir.1999) ("[W]hile claimants have submitted evidence that the market rates for similarly experienced counsel exceed the statutory rate, they have not demonstrated that no suitable counsel would have taken on claimants' case at the statutory rate"); *Love,* 924 F.2d at 1496–97 (remanding for further findings as to availability of attorneys in the area with similar skills who would have handled the case at the statutory rate, where the only evidence in the record was the statement of the attorney seeking fees that there were few other lawyers in Oregon with his expertise in pesticide litigation and the district court had made no findings on the issue).

Van Der Hout states:

"The vast majority of the immigration bar of this country does not engage in federal court litigation, and of those that do, only a very small number would be willing to take on a case of this complexity. There are no qualified attorneys to my knowledge who would have undertaken such litigation at the EAJA statutory rate adjusted for inflation of $160 per hour in 2006, or $171 per hour in 2008." [55]

Plaintiffs also proffer the declaration of Carol A. Sobel, who since 1997 on an annual basis has surveyed firms to obtain rele-

---

**54.** Declaration of Marc Van Der Hout, ("Van Der Hout Deck"), ¶ 11.

**55.** Van Der Hout Decl., ¶ 12.

vant comparisons of billing rates.[56] Sobel is personally familiar with all but two of the attorneys who represented plaintiffs.[57]

Sobel concludes that, with respect to Rosenbaum, his requested hourly rate of $625–675 for work performed between 2005 and 2008 is "at the very low end of, if not below, market rate for an attorney of [his] skill, reputation and experience."[58] As further evidence of the reasonableness of Rosenbaum's requested rate, Sobel details several cases in which courts have awarded similar or higher hourly fees for attorneys of like experience.[59] Similarly, Sobel offers an extensive analysis of the hourly rates sought for Natarajan, Rabinovitz, Tumlin, and Joaquin, citing the rates charged by comparable attorneys and attorneys' fee awards in comparable cases.[60]

Finally, plaintiffs have submitted the declaration of Angelo A. Paparelli. Paparelli has practiced immigration and nationality law in Los Angeles since 1981.[61] He states:

> "It is my opinion that such litigation requires attorneys who are familiar with immigration law and procedures as well as experienced in class action litigation. My firm (in collaboration with a qualified litigation lawyer or firm) would consider such a case if we were assured we would be compensated at our normal billing rates. I am generally familiar with the relatively few attorneys in the Los Angeles area that would be able to consider taking such a case, and I believe that such attorneys were not avail-

able at the EAJA statutory rate of $155–$172 per hour during the period of this litigation."[62]

Despite this evidence, the government asserts in conclusory fashion that "[t]here simply has been no showing that other practitioners would not have been willing to take this case for the EAJA statutory rate."[63]

In *Nadarajah,* the only piece of evidence cited by the appellate court on the subject of other attorneys of comparable skill willing to handle the matter at EAJA rates was Van Der Hout's declaration. The government objected to the declaration's sufficiency in that case, and the Ninth Circuit concluded that its objection lacked merit. *Nadarajah,* 569 F.3d at 915. Here, plaintiffs have presented not only the Van Der Hout declaration, but Sobel's extensive analysis of market rates and attorneys' fees awards in the Los Angeles area. They also offer Paparelli's statement his firm would not have accepted plaintiffs' representation except at market rates, and that plaintiffs' request is in line with such rates.

In *Nadarajah,* the appeals court quoted a First Circuit opinion concerning the type of "showing that is necessary to establish that qualified counsel was not available." It stated:

> " 'What the declaration needed to say, with at least modest support, is that as a practical matter the plaintiffs would be unable to find a fisheries law expert for

---

56. Declaration of Carol A. Sobel, ("Sobel Decl."), ¶¶ 2–3. Sobel's survey includes larger law firms and smaller boutique civil rights law firms. Sobel found that there is little, if any, difference in the fees sought and awarded to smaller or solo civil rights firms and larger business firms. (*Id.* ¶ 3.)

57. *Id.* ¶ 5.

58. *Id.,* ¶ 7–8.

59. *Id.*

60. *Id.,* ¶¶ 9–19.

61. Declaration of Angelo A. Paparelli, ("Paparelli Decl."), ¶¶ 2–3.

62. *Id.,* ¶ 4.

63. Govt.'s Opp. at 27.

$125 (assuming *arguendo* that one was required). We say "modest support" because of practical realities. No one expects the plaintiffs to conduct statistical surveys on a collateral matter like attorney's fees, and the antitrust laws do not encourage counsel to spend much time discussing fee levels with competing lawyers.'" *Id.* at 915 (quoting *Atlantic Fish Spotters Association v. Daley,* 205 F.3d 488, 492–93 (1st Cir.2000)). Employing this standard, the Ninth Circuit concluded that "Van Der Hout's declaration satisfactorily demonstrate[d] that no other counsel was available to take Nadarajah's case at the adjusted statutory maximum hourly rate." It further found that "the government ha[d] failed to rebut Nadarajah's showing that qualified counsel was not available." *Id.* Because the Ninth Circuit has explicitly held that, absent rebuttal, even a portion of the voluminous evidence presented in this case suffices to demonstrate that qualified counsel were not available to handle the action at the EAJA statutory rate, the court finds that plaintiffs have made an adequate showing on this point.

### 2. Objections to Specific Fees

#### a. Internal Communications

 The government objects to the time charged for internal communications among counsel where the subject of the communication is not noted in the attorneys' time records. The government cites *Tchemkou v. Mukasey,* 517 F.3d 506 (7th Cir.2008), in which the Seventh Circuit stated:

"[T]he Government believes it is 'wholly unreasonable' for it to 'pay for three hours of work for each one-hour conversation among three attorneys.' The Government appears to argue for a blanket rule according to which internal communication time never would be re-imbursed under the EAJA. Such a rule would be totally unrealistic. The practice of law often, indeed usually, involves significant periods of consultation among counsel. Talking through a set of authorities or seeking advice on a vexing problem is often significantly more efficient than one attorney's trying to wade through the issue alone. To be sure, internal meetings are not always the model of efficiency, and discussions of one case or client easily can bleed over into other matters. Consequently, attorneys seeking reimbursement for internal meetings should identify' explicitly the subject matter of their discussions so that we may assess whether the amount of time recorded was 'reasonably expended.' In the present case, few details are provided with respect to the internal communications of Ms. Tchemkou's counsel. Although we do not doubt that some internal communication was necessary to coordinate the successful effort on behalf of Ms. Tchemkou, without the benefit of greater explanation from counsel, we cannot say that all of the internal communication time was 'reasonably expended.'"
*Id.* at 511–12 (internal citations omitted).

The court finds the reasoning of the Seventh Circuit on this point persuasive. The court, however, cannot locate instances in which plaintiffs' lawyers billed for internal communications without identifying the subject matter of the conversation. The only example cited by the government is 3.75 hours purportedly billed by Ramirez for calls with co-counsel on unidentified subjects. The court has reviewed Ramirez's time records and cannot locate such an entry. Each entry concerning conference calls contains a phrase following "re:" that describes the general subject matter of the discussion.[64] The court has

---

64. Ramirez Decl., Exh. A.

reviewed the entries of the other attorneys representing plaintiffs as well, and found that they too identify the subject matter of internal communications. The government's objection on this score, therefore, is not supported by the record.

### b. Billing Records of Mark Rosenbaum

■ The government objects to the fees requested for Rosenbaum's time, which total $11,043.76. The basis for the objection is the following statement in Rosenbaum's declaration: "I maintained time records on a contemporaneous basis. Those records were misplaced, and I reconstructed them based on recollection, references to me in the records of other counsel and other documents we filed with the district court or submitted to the government."[65] The government maintains that this type of post hoc reconstruction does not permit it to determine the accuracy or reasonableness of Rosenbaum's recollection.[66] Plaintiffs counter that several of Rosenbaum's hours can be verified by the time records of other counsel and/or by court transcripts, and that the 18.6 hours he underestimates the amount of time he spent. Plaintiffs note, moreover, that in an abundance of caution, they applied a five percent discount to Rosenbaum's hours to ensure that they were not overstated.[67] On review, the court finds that most of the hours for which Rosenbaum seeks compensation involved the type of work that cannot be verified by other billing records.

Plaintiffs' fee request is based on an across-the-board five percent reduction in the number of hours reflected in the time records. The court does not wish to penalize plaintiffs for applying this discount, and thus reduces the fee award attributable to Rosenbaum by an additional 20%. The plaintiffs are awarded $9,300.00, a reduction of $2,325.00 in the amount requested for Rosenbaum's time.

### c. Work Completed Prior to October 11, 2006

The government asserts that plaintiffs should receive no fees for work completed prior to the court's October 11, 2006 order modifying paragraphs 2 and 11 of the injunction.[68] Plaintiffs assert that they "have deducted time spent on activities not directly related to the success of the litigation, including investigating and monitoring compliance issues that were not raised to the court or the government in the litigation, and time spent on unsuccessful work (e.g. a motion for reconsideration of a portion of the Oct. 11, 2006 order, and the defense of the two injunction provisions that were dissolved)."[69] The government asserts that 359.65 hours remain that are attributable to drafting briefs on the facial conflict issue, preparation and practice for the oral argument on the facial conflict issue, and the hearing on that subject.[70]

■ The government argues similarly that plaintiffs did not prevail on, and thus are not entitled to fees for, work on a motion to compel production of documents regarding detention standards.[71] Plaintiffs counter that the motion was part of an overall strategy that ultimately proved successful, and additionally, that they succeeded in compelling discovery on an addi-

---

**65.** Rosenbaum Decl., ¶ 5.

**66.** Govt.'s Opp. at 27–28.

**67.** Pls.' Reply at 38. The discount was not unique to Rosenbaum. Plaintiffs applied a five percent discount to all attorneys' hours in their fee motion.

**68.** Govt.'s Opp. at 33–34.

**69.** Motion for Attorneys' Fees at 15.

**70.** Govt.'s Opp. at 28–29.

**71.** *Id.* at 29.

tional detention standard, which resulted in the production of approximately 1,200 pages of additional documents. These documents concerned detention conditions in hold rooms, which was cited as an instance of non-compliance with the injunction in the court's July 2007 order.

As the Ninth Circuit has noted: "Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war. Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning. The County would have us scalpel out attorney's fees for every setback, no matter how temporary, regardless of its relationship to the ultimate disposition of the case. This makes little sense. We hold, instead, that a plaintiff who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage." *Cabrales v. County of Los Angeles,* 935 F.2d 1050, 1053 (9th Cir.1991). The court agrees with plaintiffs that developing evidence of the government's non-compliance with the injunction was a critical component of their ultimate success in defending against the government's request for dissolution. Thus, even had plaintiffs' motion been denied outright, and even had no additional discovery been produced, the court would not have denied all fees associated with the motion. The motion was not completely unsuccessful, however, as plaintiffs obtained additional documents that the court found relevant and persuasive in determining whether it was appropriate to dissolve the injunction. Plaintiffs thus achieved a degree of success in bringing the motion. Considering the significance of the overall relief plaintiffs obtained in relation to the hours their lawyers reasonably expended, and the fact

that the motion was not entirely unsuccessful, the court declines to reduce the fee award by the number of hours spent litigating the motion to compel discovery.

Turning to plaintiffs' work on the facial conflict argument, the court considers the Ninth Circuit's holding in *O'Neal v. City of Seattle,* 66 F.3d 1064 (9th Cir.1995). There, the court concluded that a plaintiff could recover fees for a failed class certification motion because she ultimately prevailed on a claim related to the causes of action on which she sought certification of a class. The Ninth Circuit identified the appropriate two-part inquiry as follows:

"First, the court asks whether the claims upon which the plaintiff failed to prevail were related to the plaintiffs successful claims. If unrelated, the final fee award may not include time expended on the unsuccessful claims. If the unsuccessful and successful claims are related, then the court must apply the second part of the analysis, in which the court evaluates the 'significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended.' If the plaintiff obtained 'excellent results,' full compensation may be appropriate, but if only 'partial or limited success' was obtained, full compensation may be excessive." *Id.* at 1068–69 (quoting *Thorne v. City of El Segundo,* 802 F.2d 1131, 1141 (9th Cir.1986)).

Claims are related where they involve "a common core of facts" or are "based on related legal theories." *Odima v. Westin Tucson Hotel,* 53 F.3d 1484, 1499(9th Cir. 1995). "[T]he test is whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury upon

which the relief granted is premised." *Id.* (quoting *Thorne,* 802 F.2d at 1141).

The government's request that the court dissolve paragraphs 2 and 11 of the injunction due to a conflict with the expedited removal statute was "related to" the government's broader request that the court dissolve the injunction altogether, in that both requests involved a common core of facts and related legal theories.

Plaintiffs achieved some success in opposing the government's request that the court dissolve paragraphs 2 and 11. Most fundamentally, the court did not dissolve the paragraphs, but modified them to ensure that they were compatible with the requirements of the expedited removal statute. Plaintiffs' work thus ensured that class members placed in expedited removal would receive the protections of the injunction to the extent appropriate, including an advisal regarding their right to apply for asylum. Additionally, plaintiffs' efforts brought to light the fact that the government took the position that the *Orantes* injunction did not apply to Salvadorans detained at ports of entry. This led to the court's later clarification that the injunction did apply to such class members. Nonetheless, because plaintiffs were only partially successful in this phase of the proceedings, the court concludes it is appropriate to reduce the fees they seek to some degree. By the court's calculation, plaintiffs seek $140,294.50 in fees for the phase of the litigation related to expedited removal. The court reduces this amount by one-third, or $46,764.83.

### d. Fees Related to Clients' Declarations

■ The government contends that plaintiffs' fee request for time and travel to Texas to collect declarations from 37 recently detained Salvadorans is excessive and unnecessary.[72] The court ultimately concluded that the "sample size ... [was] too limited to support an inference that there [was] a widespread pattern of noncompliance, particularly given the credibility limitations." *Orantes IV,* 504 F.Supp.2d at 848. As noted, it is rare to find a litigant "who doesn't lose some skirmishes on the way to winning the war." *Cabrales,* 935 F.2d at 1053. The government cites no authority for the proposition that the court should second guess decisions made during the course of lengthy litigation regarding what pieces of evidence are, and are not, worth gathering. The court therefore declines to excise fees related to the preparation and submission of the client declarations.

### e. Fees Unrelated to the Motion to Dissolve

■ The government requests that the court decline to award fees for 50.85 hours of work done between October and December 2007 by Joaquin and Ramirez related to the closing of the San Pedro Service Processing Center. Plaintiffs counter that they are entitled to fees for enforcing compliance with consent decrees or injunctions. See, e.g., *San Francisco NAACP,* 284 F.3d at 1166 ("It is well settled law in this circuit that a district court has discretion to award fees to a prevailing party in consent decree litigation for work reasonably spent to monitor and enforce compliance with the decree, even as to matters in which it did not prevail"). While this is a correct statement of the law, it is inapposite. Plaintiffs' enforcement activities at the San Pedro center are not only not described in their motion for attorneys' fees, but also appear unrelated to the dissolution proceedings pending that were before the court. As a consequence, the court cannot determine the reasonableness of the $19,970.25 in fees sought, and declines to award them.

---

72. Govt.'s Opp. at 34–35.

■ The government also objects to 8.2 hours charged for dealing with the media.[73] Prevailing counsel are entitled to fees for "press conferences and performance of other lobbying and public relations work" when those efforts are "directly and intimately related to the successful representation of a client." *Davis v. City and County of San Francisco,* 976 F.2d 1536, 1545 (9th Cir.1992). Plaintiffs assert that the time spent responding to media inquiries heightened the visibility of the injunction and led to discovery of violations. This in turn contributed directly to plaintiffs' litigation goal of preserving the injunction.[74] The government has not demonstrated that incurring 8.2 hours over the course of several years of litigation to communicate with the media was unreasonable or excessive, nor that the information obtained from class members as a result of such contacts did not benefit plaintiffs' litigation position. The court therefore declines to reduce the fee award on this basis.

### f. Alleged "Excess" During District Court Proceedings

■ The government alleges a number of instances of excessive billing during the proceedings in district court. First, it asserts that it was unreasonable for Joaquin to spend 29 hours preparing for oral argument. The court agrees and finds that no more than 21 hours was required. Similarly, the court finds that the 68.1 hours spent drafting plaintiffs' opposition brief was excessive. It will award a total of 40 hours for this activity. Tumlin charged 45.7 hours preparing for two depositions. The court concludes that only 24 hours were reasonably expended. A law clerk

charged 53 hours preparing a memorandum that evaluated the testimony of two witnesses. The court believes only 20 hours were reasonably incurred.

Cumulatively, these changes result in a $28,860.00 reduction in the amount of fees awarded.

### g. Alleged "Excess" During Circuit Court Proceedings

■ The government asserts that plaintiffs' request that the court award $203,233.43 to write one appellate brief is excessive. The government identifies three line items that it asserts should be reduced or eliminated. It cites the fact that Joaquin billed 42 hours, or $26,274.63, to draft the procedural background section of the appellate brief.[75] As the government notes, preparation of such a summary could have been delegated to a less experienced member of the litigation team and could have been accomplished in less time. Confronting a similar situation, the Third Circuit stated:

> "Nor do we approve the wasteful use of highly skilled and highly priced talent for matters easily delegable to non-professionals or less experienced associates. Routine tasks, if performed by senior partners in large firms, should not be billed at their usual rates. A Michelangelo should not charge Sistine Chapel rates for painting a farmer's barn." *Ursic v. Bethlehem Mines,* 719 F.2d 670, 677 (3d Cir.1983).

The court concludes that a paying client would not have paid $650 an hour for 42 hours of lead counsel's time to prepare the procedural background section of the appellate brief, when the task could have been performed by a less senior, less expensive associate.[76] As noted, plaintiffs ap-

---

73. *Id.* at 35.

74. Reply at 30–31.

75. Opp. at 31–32.

76. The court appreciates Joaquin's familiarity with the overall litigation. If this is the reason that he elected to prepare the procedural background section of the brief, it finds alter-

plied an across-the-board five percent reduction in the number of hours reflected in the time records. The court finds a further reduction of seventy percent in Joaquin's time for drafting the procedural background section of the appellate brief appropriate. Consequently, the court reduces the amount awarded for this line item by an additional $19,360.25, for a net award of $6,914.38.

In addition, Joaquin expended 56.9 hours, at a cost of $35,135.75, preparing for a twenty-minute appellate argument.[77] Given that Joaquin had already participated in extensive oral argument in the district court, and given the limited time allotted for the argument, he should have been able to prepare more efficiently. Plaintiffs applied an across-the-board five percent reduction in the number of hours reflected in the time records. The court finds that a further reduction of forty-five percent in the amount of time Joaquin spent preparing for oral argument is appropriate. Consequently, the court reduces the amount awarded for this task by an additional $16,643.25, for a net award of $18,492.50.

Plaintiffs also claim 180.1 hours for revision of their appellate brief, including 126.1 hours charged by five attorneys and 54 hours charged by law clerks, for a total cost in excess of $50,000. Joaquin, billing at $650 per hour, spent 38.1 hours revising the brief, while four other attorneys, billing $300 to $385 per hour, expended 88 hours on revisions. Law clerks, billing at $75 per hour, revised the brief for an additional 54 hours. Such extensive revision, equivalent to more than 2.5 hours and almost $1,000 per page, is excessive. As noted, in formulating their fee request, plaintiffs applied an across-the-board five

percent reduction in the number of hours billed by attorneys and a twenty percent reduction in the number of hours billed by law clerks. The court finds a further reduction of forty-five percent in the number of hours billed by attorneys and of thirty percent in the number of hours bill by law clerks for revision of the appellate brief is appropriate. Consequently, the court reduces the fee award for this task by $16,643.25, and awards $18,492.50 for revision of the appellate brief.

As respects the appellate phase of the proceedings, therefore, the court reduces the fees plaintiffs seek by $61,113.28.

### D. The Amount of Costs

Plaintiffs also request that the court tax certain costs to the government. As noted, the EAJA allows for the recovery of both fees and costs. The statute states, in relevant part, that "a court shall award to a prevailing party other than the United States fees and other expenses...." 28 U.S.C. § 2412(d)(1)(A). Plaintiffs seek $37,290.83 in district court costs, and $236.75 in appellate costs; they include such items as telephone calls, photocopying, postage, and attorney travel expenses. The amounts claimed are reasonable and recoverable. *Jean v. Nelson,* 863 F.2d 759, 778 (11th Cir.1988) ("[W]e reject the government's argument that telephone, reasonable travel, postage, and computerized research expenses are not compensable under the EAJA"); *Aston v. Secretary of Health and Human Services,* 808 F.2d 9, 12 (2d Cir.1986) (affirming an award of telephone, postage, travel and photocopying expenses); *International Woodworkers of America v. Donovan,* 792 F.2d 762, 767 (9th Cir.1985) (expenses routinely billed to a client—telephone, air courier,

---

natively that his drafting of the section should have been substantially more expedited than it was.

77. Govt.'s Opp. at 32. This amounts to $1,756.79 for each minute of oral argument.

attorney travel—are recoverable under the EAJA); *United States v. Hitachi America, Ltd.,* 101 F.Supp.2d 830, 833, 838 (C.I.T.2000) (awarding costs under the EAJA, *inter alia,* for deposition, pretrial and trial transcripts). Plaintiffs are therefore entitled to recover total costs of $37,527.58.

### III. CONCLUSION

For the reasons stated, the court grants in part plaintiffs' motion for attorneys' fees under the EAJA. The court's reductions in the fees requested total $158,360.37. After subtracting this amount, the court awards plaintiffs attorneys' fees of $1,306,360.44 and costs of $37,527.58, for a total award of $1,343,888.02. The government is directed to pay this sum to petitioner on or before May 30, 2010.